```
 1              COURT OF COMMON PLEAS

 2              HAMILTON COUNTY, OHIO

 3                     - - -

 4  STATE OF OHIO,

 5           Plaintiff,
                          Appeal No. C150515
 6  vs.                  Case No. B1404497
                          Volume 1
 7  JASON GLENN,          Voir Dire

 8           Defendant.

 9

10                     - - -

11    COMPLETE TRANSCRIPT OF PROCEEDINGS ON APPEAL

12                     - - -

13  APPEARANCES:

14  CLAY THARP, ESQ.,
            On behalf of the Plaintiff.
15
    KORY JACKSON, ESQ.,
16            On behalf of the Defendant.

17

18

19

20           BE IT REMEMBERED that upon the jury

21  trial of this cause, heard on Wednesday, July

22  15, 2015, before the Honorable Patrick T.

23  Dinkelacker, a said Judge of the Court of

24  Common Pleas, the following proceedings were

25  had, to wit:
```

```
 1    MORNING SESSION - Wednesday, July 15, 2015

 2              THE COURT:  For the record, State

 3      of Ohio versus Jason Glenn, Case Number

 4      B1404497.

 5              Mr. Jackson, you represent

 6      Mr. Glenn?

 7              MR. JACKSON:  That's correct,

 8      Judge.

 9              THE COURT:  This matter is on the

10      docket for jury trial.  We are in the

11      process right now of putting a jury

12      together.

13              Mr. Tharp, did you want to put

14      something on the record, sir?

15              MR. THARP:  Yes, Judge.  I think in

16      fairness to the defense and the State, we

17      should put the offer or discussions

18      placed on the record.

19              Right now, the defendant is facing

20      two counts of trafficking in heroin,

21      felony of the second degree, and

22      possession of heroin, felony of the

23      second degree.  Each count, should the

24      defendant be convicted, carries between

25      two to eight years.  I believe if he was
```

1    convicted of both, they would merge, so

2    he would be looking at a two to

3    eight-year sentence.

4        Today there has been extensive plea

5    discussions, although there has been a

6    Motion to Suppress, which generally would

7    negate any plea discussions from the

8    State and defense.  Because there are

9    some ancillary matters, at this time the

10   defense had approached the State asking

11   for a one-year in prison agreed term.

12       The State has, based on the

13   defendant's record, decided it has no

14   interest.

15       As a counteroffer, the State has

16   two options available to the defendant.

17   The defendant can plead to trafficking in

18   heroin, a felony of the second degree.

19   We will dismiss the possession of heroin,

20   felony of the second degree, and just

21   leave the plea to the Court.  The Court

22   can make any decision on sentencing.

23   However, it should be between two to

24   eight years.

25       Should the defense not wish to do

1    that, we would engage and ask the Court

2    to accept a plea to trafficking in heroin

3    as a felony of the third degree.  And at

4    that time an 18-month agreed sentence

5    with, of course, dismissing possession of

6    heroin, Count 2, in exchange for that

7    plea.

8        Those are the plea discussions,

9    Judge.  I know that, per procedure, most

10   courtrooms, once the jury hits the door,

11   that's the last opportunity the defense

12   has to make any sort of plea arrangement.

13       For the record, those are the plea

14   negotiations that have been discussed

15   today.

16       THE COURT:  Thank you, Mr. Tharp.

17       Mr. Jackson, anything else, sir?

18       MR. JACKSON:  Judge, I would

19   acknowledge that the plea offers were

20   made.  They were discussed with Mr. Glenn

21   and Mr. Glenn chooses to maintain his not

22   guilty plea and wants to go forward with

23   trial.

24       THE COURT:  Okay.  I appreciate

25   that.  Thank you very much.

1          The only thing I would add is, once

2    the jury does come in, I am not involved

3    in plea negotiations.  That's fair.  You

4    certainly are entitled to a jury trial.

5    If that's what you want, that's what you

6    will have.  If you are convicted, it is

7    totally up to me as to whether or not the

8    presumption is -- Mr. Jackson is a very

9    good attorney -- presumption is that you

10    go to prison, my pick, anywhere from two

11    to eight years.

12          I am not sure we talked about the

13    Federal thing.  I am not sure what all

14    that is.  Quite frankly, I know you do,

15    Mr. Jackson.  I don't know what that

16    means with the Federal thing.

17          I know, in front of me, you would

18    be looking at two to eight years, unless

19    you would overcome the presumption which,

20    I will be perfectly blunt, with your

21    record, it would be very hard for me to

22    do.  So, that's where we are.

23          MR. THARP:  There was also

24    discussion of some sort of stay, should

25    the defendant plea.  I have nothing to do

1 with that.  I would ask for the plea and

2 leave it to the Court, whether it was a

3 week or two.  That's between the Court

4 and the defense.  I don't know if that's

5 a question that's causing some sort of

6 delay.  That's something I wished to

7 mention.

8    THE COURT:  I have not been

9 involved in that.  If he was to plead

10 today, I would have no problem with a

11 short stay before sentence would begin,

12 but that's all I can say about that.

13    MR. JACKSON:  We understand, Your

14 Honor.  I certainly didn't represent the

15 Court said something different from what

16 the prosecutor and I discussed.  I

17 discussed that with my client.

18    THE COURT:  I thought about this

19 earlier.  I told you gentlemen 1 o'clock

20 tomorrow.  That Judge's lunch thing that

21 I have, I am willing to move that around,

22 maybe stop in at five minutes -- think

23 about 11 o'clock, if you would.  I want

24 to make sure we get it done.  Friday at

25 noon, I have to leave.

1          Is that okay, Mr. Jackson?

2          MR. JACKSON:  It is, Your Honor.

3          THE COURT:  I appreciate that.

4     Thank you for your cooperation.

5          MR. THARP:  Thank you, Judge.

6          (Prospective Jurors entered the

7     courtroom.)

8          THE COURT:  Good afternoon.  My

9     name is Judge Pat Dinkelacker.  I will be

10    presiding over this case.  You will be

11    with me until you are told otherwise.

12         Before I do anything else, I note

13    the hour is 1:25.  I know you have been

14    here since early this morning.  We

15    appreciate your patience.  I can assure

16    you that nobody has been sitting around

17    twiddling their thumbs while you are up

18    there sitting around.  We have had work

19    to do.  This is the first time we could

20    get to you.  I do appreciate your

21    patience and I do appreciate your

22    cooperation.  Our system wouldn't work

23    without people like you.  So, thank you

24    very much.

25         You have been summoned as

1    prospective jurors in a criminal case,
2    which is captioned State of Ohio versus
3    Jason Glenn, Case Number B1404497.  It is
4    not my job to tell you what the case is
5    about.  That will come as we go along
6    here.  It is a two-count indictment.
7         The first count alleges trafficking
8    in heroin.  The second count alleges
9    possession of heroin, not to tell you
10   that these are the facts.  The alleged
11   facts, very briefly, so in case you have
12   been somehow connected to this, the
13   alleged facts are July 21, 2014,
14   Cincinnati police officers made a traffic
15   stop at 3417 Warsaw Avenue, and in the
16   course of that, they found drugs and
17   other drug paraphernalia and allegedly it
18   was found for Mr. Jason Glenn.
19        Hopefully, nobody has any contact
20   in regards to that, knows anything about
21   it.  So, we will go from there.
22        By way of introduction, that's part
23   of my job is to introduce to you who is
24   involved in this case.
25        First of all, the prosecutor in

1    this case is Mr. Clay Tharp.  Mr. Tharp,

2    obviously, you can introduce anybody that

3    you feel is appropriate.

4          MR. THARP:  We just would ask that

5    Officer Turner from Cincinnati Police

6    Department is allowed to sit as State's

7    representative.

8          THE COURT:  That's fine.  No

9    problem.  Thank you very much.

10         The Defense Attorney is Mr. Kory

11    Jackson.

12         MR. JACKSON:  Good afternoon.

13         THE COURT:  Thank you.

14         The defendant in this matter is

15    Mr. Jason Glenn.  Could you stand up for

16    a second, please, sir.

17         THE DEFENDANT:  Good afternoon.

18         THE COURT:  Thank you, sir.  I

19    appreciate that.

20         As far as the staff, you have

21    already met Mr. Chris Collini.  He is the

22    Bailiff.  He is kind of in charge of the

23    courtroom, but don't let him know that.

24    If you have any problems, any questions,

25    any concerns whatsoever, Chris will help

1    you out.  He has done this for a long

2    time.  We have done this together for a

3    long time.  He is very helpful.  He

4    understands what the needs are of jurors.

5    If you need anything, check with Chris.

6    He will help you out.  He is kind of in

7    your charge, so he will work with you.

8         My constable is Ms. Emily Albrink.

9    She is in charge of my civil docket.  She

10   will be doing a lot of different things.

11   She works all the civil stuff.  Chris

12   does the criminal stuff.  She also is a

13   law student.  And tomorrow she has an

14   exam.  She is using some of her valuable

15   vacation time to study for an exam

16   tomorrow.  So, she won't be here.  But,

17   in the meantime, she is doing some other

18   things to help us along.  And if you have

19   any problems, she is very, very nice.

20   She will help you out in any way she can

21   also.

22        And the most important person in

23   the courtroom -- you probably think I am

24   going to talk about myself now.  That's

25   incorrect.  The most important person in

1     the courtroom is my court reporter,

2     Ms. Ann Marie Stowers.  I say that for a

3     reason.  This is a Court of Common Pleas.

4     It is the highest trial court in the

5     State of Ohio.  Everything that takes

6     place in this courtroom is taken down by

7     her and noted for the record for purposes

8     of appeal or for purpose of, later on, if

9     somebody needs to review something.

10         And I say that because as she is

11    taking everything down during the course

12    of this procedure in selecting the jury,

13    you will be asked to talk to us a little

14    bit and give us certain information, or

15    whatever, and I would ask that, first of

16    all, you keep your voice up so everybody

17    can hear you, especially her, and if you

18    can't hear something, let us know.  We

19    will help you out with that.

20         This is a nice, easy procedure.

21    You are probably nervous if you have not

22    been through this before.  But it will

23    work for you.  You won't have problems.

24         The State of Ohio and the defendant

25    are entitled to jurors who approach this

1    case with open minds and agree to keep

2    their minds open until a verdict is

3    reached.

4         Jurors must be as free as humanly

5    possible from bias, prejudice or sympathy

6    and not be influenced by preconceived

7    ideas, either as to the facts or as to

8    the law.

9         You are all undoubtedly qualified

10   to serve as jurors. However, there may

11   be something that could disqualify you in

12   this particular case.

13        So very shortly, myself, as well as

14   counsel, will ask you some questions.

15   These questions are not designed to pry

16   into your personal affairs. We really

17   don't care about your personal affairs.

18   But they are to discover if you have any

19   knowledge of this particular case, if you

20   have any preconceived opinions that you

21   cannot lay aside, or if you have had any

22   experience that might cause you to

23   identify yourself with either party.

24        These questions are necessary to

25   assure each party a fair and impartial

1    jury.  Along those lines, we start,

2    ladies and gentlemen, with an oath.  I

3    ask that you all rise, raise your right

4    hand, and Mr. Collini will administer the

5    oath.

6         (Prospective jurors were sworn.)

7         THE COURT:  Thank you very much.

8    Please be seated.

9         Now, ladies and gentlemen, the

10    attorneys and myself are going to ask you

11    some questions as we select the jurors

12    for this case.

13         Please relax.  I mean that.  I know

14    both of these attorneys.  They are very

15    good people, very professional.  They

16    know that I wouldn't let them get away

17    with being mean to you, anyway, not that

18    they would do it.  Just relax, take it

19    easy and we will get through this

20    procedure.  You are obviously not on

21    trial for anything, so, please, just

22    answer the questions as truthfully and as

23    best you can.  You will not have any

24    problems with this procedure.  Just

25    relax.

1    I am going to ask counsel, my

2    questions will be directed along the same

3    lines to the 12 people in the box.  What

4    that means is, they are not any more

5    important than the people in the back.

6    And you will see, for one thing, we are

7    picking at least one alternate, maybe

8    two.  There will be two other people from

9    the back already that are going to sit in

10   the chairs next to the jury box.

11   But to keep the thing moving, not

12   bog down a lot, you will see what I mean

13   very shortly.  I will direct the

14   questions to the people in the box as our

15   counsel.

16   If you in the back have any

17   questions, any problems or any concerns,

18   unless it is a real pressing thing, just

19   make a note of that, if you will.  When

20   you are called to get into the box and

21   replace somebody that has been excused,

22   for whatever reason, I will ask you, were

23   you able to hear the questions, do you

24   have any questions, any problems or any

25   concerns with anything that was asked and

1    at that time, ladies and gentlemen, then

2    you can tell me whatever you were

3    thinking, whatever you heard that you

4    think might be of concern.  It does move

5    it along a lot quicker.  I think you will

6    appreciate that, especially those sitting

7    back there on the hard bench.  You guys

8    at least got cushions.  Bear with us.  It

9    is an important part of the procedure.

10        With that then, I will ask you a

11    few questions before I ask Mr. Tharp to

12    step up.

13        People in the box, do any of you

14    have any type of relationship whatsoever

15    with the parties that have been named so

16    far?  Anybody?

17        Any relationship with either of the

18    lawyers?  Anybody?

19        Mr. Tharp, the prosecutor;

20    Mr. Jackson, the defense attorney.  Thank

21    you.

22        Any previous experience with

23    juries?  Some of you have noted those on

24    the jury questionnaires which we have and

25    counsel have reviewed.

1          Has anybody been on previous jury,

2     just raise your hand if you have, in the

3     box.  That makes that simple.

4          Does anybody have a personal

5     interest in the outcome of this case, for

6     whatever reason?  Thank you.

7          As far as the length of the trial,

8     are you all first weekers?  Anybody a

9     second weaker?  You know what I mean by

10    second weeker?  Good.  I don't know that

11    it would, but you never know with juries,

12    if it goes into next week, for some

13    reason, it could, correct, Mr. Tharp,

14    Mr. Jackson?  But we don't anticipate

15    that.

16         MR. THARP:  Possible.  Not

17    anticipated.

18         MR. JACKSON:  That's correct, Your

19    Honor.

20         THE COURT:  Anything is possible.

21    If it would spill into next week, is

22    everybody okay with coming back, say,

23    Monday, Tuesday?  Everybody okay with

24    that?  Thank you all very much.

25         As far as the schedule, we will go

1  today. You will not like this, but at

2  2 o'clock, I have to go next door for the

3  investiture of a judge who actually took

4  my place on the Court of Appeals. I have

5  to be there for, like, 10 or 15 minutes.

6  But that's all. At 2 o'clock we'll take

7  a quick break. I have to go over there.

8  You can watch me go down the hallway. I

9  will be there 10, 15 minutes, come back,

10  and from that point on, we will go no

11  later than 4:30. I never go later than

12  4:30 unless the jury asks me to go later,

13  unless you are in deliberations. If you

14  are not used to being downtown and stuff,

15  there are a lot of things going on, so I

16  found out over many years, I have done

17  that over many years and it has worked

18  out good. Does that fit with everybody's

19  schedule today?

20          Anybody have a baby or kid they

21  have to pick up at 3:30? That's more

22  important than this. Thank you.

23          As far as tomorrow goes, we have a

24  regular docket. We will ask you to come

25  back at 11:00, start at 11:00 and go

1    through until -- I have one other thing I

2    have to spend a couple minutes on, but we

3    will go until 4:30 and then Friday, we

4    will go until noon.  I have something I

5    have to be at at 1:30.  I need to take

6    care of that.

7        Everybody okay with that?  You guys

8    are a great group of jurors.  I

9    appreciate that.  Thank you.

10        Does anyone have a problem hearing

11    or a physical situation that might

12    require some type of accommodation?

13        PROSPECTIVE JUROR HARLOW:  I wear a

14    hearing aid.

15        THE COURT:  I appreciate that.  As

16    long as I make the people take the stand

17    and speak up, will you be okay?

18        PROSPECTIVE JUROR HARLOW:  Yes.

19        THE COURT:  We have a device, if,

20    for some reason, you are selected to be

21    on the jury, let us know and we will try

22    to get it to work properly or get one

23    from another courtroom.  We want to make

24    sure you will be able to hear.  Thank you

25    for bringing that to our attention.  I

1    appreciate that.

2          Anybody else?  Thank you.

3          Does anyone have any religious or

4    philosophical belief which would prevent

5    them from making a judgment regarding the

6    facts in this case?  Thank you.

7          At the conclusion of the trial, I

8    will provide you with written

9    instructions of the law.  You will apply

10   them to the facts as you determine them

11   to be.  Would any of you have any

12   difficulty applying the law as I give it

13   to you, even if you disagree with the law

14   or think the law should be different?

15   That is important.  You will see why as

16   we go along.  Can you all follow the law?

17   Thank you all very much, ladies and

18   gentlemen.  I appreciate it.

19          With that, I will turn it over to

20   Mr. Tharp.  Whenever you are ready, sir.

21          MR. THARP:  Good afternoon, ladies

22   and gentlemen.  As the Judge said, my

23   name is Clay Tharp.  I am an assistant

24   prosecutor here in Hamilton County.  What

25   that means is that I have the great honor

1      and privilege, and it is also my job to

2      bring this case against the defendant

3      here.

4           So the defendant has a defense

5      attorney.  I am the attorney for the

6      County, for the citizens of Hamilton

7      County, Ohio.  Everybody understand?

8      This is a Voir Dire process.  Voir Dire

9      is old French.  It means speak the truth,

10     possibly to seek, to say.  All it is, we

11     are trying to get to the bottom of

12     anyone's biases, if they have possible

13     biases.

14          I can guarantee you, if you were

15     seated where the defendant is, you would

16     want the fairest trial possible.  I can

17     tell you this.  You see a witness or a

18     victim to a crime, you would want that

19     same fair, unbiased trial.  Everybody

20     understand?

21          So, as the Judge said, we ask you

22     questions and we are not trying to pry.

23     We don't want to embarrass anybody.

24     Sometimes little things in life, little

25     situations in life, create ideas in your

1    head that bleed over and make you think

2    things you don't even realize.  Happens

3    all the time.  We see it all the time.

4         Some of you may be excused.  Please

5    don't speculate why.  Doesn't mean you

6    gave a wrong answer.  There is no right

7    answer.  Just the truth.  That's all we

8    are looking for.  People may be excused

9    for any reason.  Could be some sort of

10   strategy.  Could be the answer you give

11   could also be because someone is

12   uncomfortable being on the jury after

13   questioning.

14        As the Judge says, this is an easy

15   process and, hopefully, it will go well.

16   Please, everyone in the box, if you come

17   into the box, please do not hesitate if

18   you have a question.

19        Oh, this reminds me of this.  What

20   about this?  That's totally fine.  This

21   is the time.  Okay.  Everybody got it?

22        Can everyone hear me okay?  To be

23   fair, as the Judge said, although the

24   Judge is very important here, of course,

25   the court reporter is taking all of this

1    down.  I am very aware of it and I have

2    been scolded many times.  I speak too

3    quickly, and I am a low talker.

4    Sometimes I mumble.  If you do not

5    understand me, please stop me and say,

6    hey, speak up.  It doesn't bother me at

7    all.  I need that.  Okay.

8         How did we get here?  We allege

9    there was an event -- Judge told you

10   about it -- July of last year.  Okay.  He

11   gave you a skeletal outline of the facts.

12   Nobody is aware that occurred, was that

13   correct?  Nobody is aware of this crime;

14   is that correct?  We figure you don't

15   know much about it.

16        Following that event, there

17   eventually was an arrest.  Okay?  The

18   defendant was charged.  Once the

19   defendant is charged, it went to the

20   Grand Jury.  Grand Jury decided there was

21   enough just to indict.  This is the

22   indictment, a charging instruct.  It has

23   two counts.  It is made up of elements.

24   All this means, it informs the defendant

25   what he is accused of, informs the State

1   what we have to prove.  After that, it

2   goes to the AC and is randomly rolled,

3   randomly came to Judge Dinkelacker's

4   room.

5       I am assigned to this room for four

6   months.  It came up during my

7   presentation.  I don't have special

8   interest other than as a prosecutor, I

9   have to follow the case.  That's the

10  situation.  That's how we got here.

11  Everyone understand?

12      As the Judge said, there are two

13  counts.  I won't get into it very deeply

14  I can tell you, each count is made of

15  elements.  I think of them -- some people

16  bake or have a recipe.  I can never

17  follow a recipe.  Well, I think of it

18  like a chair.  If you have a three-legged

19  stool, you get the stuff out, you have a

20  top, you have a two-legged stool, it is

21  incomplete.

22      If you have all the legs, all the

23  parts, you have enough feet for the

24  stool.

25      Here, if we fulfill all the

1    elements beyond a reasonable doubt --

2    that's our burden here, as the Judge

3    said, in a criminal proceeding here in

4    Hamilton County, Ohio -- we fulfill these

5    elements.  If you stay on the jury, you

6    will swear an oath that you will convict,

7    beyond a reasonable doubt, if we fulfill

8    each and every element, each and every

9    crime.

10        If, in fact, we do that, that's a

11   big if, we have to put evidence on.  We

12   have to prove this, State's burden to

13   prove it.  If we do that, will everyone

14   here be able to convict?  Are you able to

15   convict?  And follow the law?

16        Because I can tell you, this is the

17   greatest system in the world.  Many, many

18   people have died for the right we have

19   here to be judged by our peers.  Judging

20   is difficult.

21        I tell you, at the end of this

22   trial, conclusion of this trial, I am

23   going to ask you to convict based on the

24   evidence.  Or, the defense is going to

25   say don't convict.  You have to make a

1    decision.  We are asking you to make a

2    decision.  That's a strong burden.  Is

3    everyone here comfortable with that?  We

4    are looking for the fairest trial. This

5    isn't a contest of personalities.  It

6    doesn't matter if you like the defense

7    attorney's tie better than mine or my

8    shoes better.  It is none of that.

9         It is based on the facts.  Every

10   decision you make, ladies and gentlemen,

11   is based on evidence, direct,

12   circumstantial, et cetera.

13        At the end of the trial, you will

14   be given written instructions on how to

15   interpret evidence.  Evidence is a couple

16   of things.  It is either physical

17   evidence -- we are hoping to introduce

18   some physical evidence.  We are hoping to

19   introduce possibly video -- but also

20   testimony.  Testimony from here.  Sworn

21   testimony.

22        Now, the Judge is like, in a way, a

23   referee, an excellent referee.  He judges

24   what evidence can be introduced.  If the

25   Judge allows in physical evidence, once

1      that is allowed in, that's evidence.

2      That's what you are to consider.

3          Once spoken evidence is allowed in,

4      once that evidence is spoken, once that

5      testimony is spoken, that becomes

6      evidence.  Does everyone understand? And

7      that's what you make your decision on,

8      not anything else, just what occurred and

9      what was said.  It is up to you to give

10     it the weight.  Do you believe some,

11     part, none, all?

12         Once it comes in, that's what you

13     will make your decision on.  That's why

14     we want to make sure there is no bias.

15     That's how you interpret evidence.  You

16     wouldn't believe some of the things we

17     have heard here in court.  Please don't

18     leave your common sense at home.

19     Sometimes people get tense, involved.

20     Sometimes they don't see things for what

21     they are because they become confused.

22     Sometimes they are what they are.  We ask

23     you to use all of your life experiences.

24         How many of you have children?  How

25     many have brothers and sisters?  How many

1       of you have been involved in a family

2       dispute over who is telling the truth?

3       Never?

4              PROSPECTIVE JUROR GRIFFITH:  When I

5       was a kid.

6              MR. THARP:  I am asking, even when

7       you were a child, everyone has learned to

8       judge credibility, situations, who is

9       telling the truth.  Everybody has

10      developed a radar for truth, credibility

11      and common sense.  We are asking you to

12      use all of those things.

13             The Judge will give you written

14      instructions.  It is basically common

15      sense.  We have all developed that radar.

16      We have to.  Everyone agree they are

17      going to use that during this trial?

18      Okay.  Great.

19             Now, the Judge mentioned there are

20      two counts of trafficking in heroin,

21      possession of heroin.  Have to tell you,

22      I will not to get into it too much.

23             Count 1, trafficking in heroin,

24      that's what we describe in the business

25      as prep for sale.  We don't expect there

1    to be evidence, there is a wiretap,

2    somebody is doing this.  This is

3    trafficking.  We believe drugs were

4    recovered that were prepared for sale.

5    Everybody good with that?  Okay.

6        Now, no one here knows me.  I never

7    had you on a case as a witness, victim,

8    associate, family?

9        And nobody knows Mr. Jackson,

10   correct?  No one knows Officer Turner.  A

11   couple other people will not be that

12   involved in the trial, not that many

13   folks we believe will testify.

14       Does anyone know Officer James

15   Adams from the Cincinnati Police

16   Department?  Possibly Brian Snowden.  He

17   is the evidence technician.  He works in

18   the Hamilton County coroner's lab.  He

19   may testify.  But I don't doubt it.  We

20   don't have very many other witnesses in

21   this matter.

22       I am jumping ahead a little bit.

23   Has anyone here been charged, accused,

24   convicted of a crime of dishonesty, a

25   felony?

1    Great.

2         MR. THARP:  Has anybody ever been

3    charged with anything?

4         PROSPECTIVE JUROR WILLIAMS:  OVI.

5         MR. THARP:  I saw that in the

6    questionnaire.  It is a crime among

7    regular people.  I am sure that wasn't

8    very satisfactory to you.

9         PROSPECTIVE JUROR WILLIAMS:

10        Personally, no.

11        MR. THARP:  Police were involved?

12        PROSPECTIVE JUROR WILLIAMS:

13        Correct.

14        MR. THARP:  Your interaction with

15   them, I am sure, was satisfactory but

16   based on that situation, do you have a

17   bias for or against police officers, or

18   anything negative that would affect your

19   judgment?

20        PROSPECTIVE JUROR WILLIAMS:  No.

21        MR. THARP:  Can you hear a police

22   officer's testimony and judge it fairly?

23        PROSPECTIVE JUROR WILLIAMS:

24        Absolutely.

25        MR. THARP:  Do you have any bias?

```
1              PROSPECTIVE JUROR WILLIAMS:  No.

2              MR. THARP:  That is the type of

3         answer we are looking for.  Has anybody

4         here had a speeding ticket?  Really?

5         This is the slowest jury I think I have

6         ever had.  That's great.

7              Okay.  Now, you have had

8         interaction with a police officer; is

9         that correct?  You see what I am saying?

10        These interactions, these things can't

11        possibly create bias.  The vast portion

12        of the jury, hold your hands up again.

13             Anybody had more than three

14        speeding tickets?  All right.  There you

15        go.  How many?

16             PROSPECTIVE JUROR STERWERF:  Four,

17        five.  Hard to keep track.

18             MR. THARP:  More than one in one

19        day?  That's when you are moving.  Those

20        that had speeding tickets, your

21        interactions with the police there, did

22        anybody have a bad reaction, one that

23        might create a bias?  Did anybody get

24        stopped, get let go?  Great.

25             But you had tickets, otherwise.
```

```
 1          See if you can learn a lesson.  Based on

 2          those interactions, ladies and gentlemen,

 3          do you have any bias?  Any bad

 4          interactions?

 5              Sir, you were released?

 6              PROSPECTIVE JUROR WHITE:  I was

 7          released.  I feel I have been pulled over

 8          four or five times.  I feel it was

 9          because of my car, what I was driving.

10          Didn't feel I was doing anything wrong

11          and they were kind of profiling.

12              MR. THARP:  That's fair.  You said,

13          based on your car.  Why do you say, your

14          car?

15              PROSPECTIVE JUROR WHITE:  I felt I

16          drive a nicer car as opposed to what's

17          used to being seen, somebody by my

18          profile.

19              MR. THARP:  What do you mean?

20              PROSPECTIVE JUROR WHITE:  Younger

21          African-American.

22              MR. THARP:  You may have noticed,

23          sir, in this case, the defendant in this

24          case is African-American; is that

25          correct?
```

1     PROSPECTIVE JUROR WHITE:  Correct.

2         MR. THARP:  I will have you note

3     this defendant was driving a car that was

4     stopped.  Would that create a problem

5     with you?

6         PROSPECTIVE JUROR WHITE:  I feel

7     like there are times you are stopped

8     because of who you are.

9         MR. THARP:  All right.  Let's back

10    up.  You are Mr. White, correct?

11        PROSPECTIVE JUROR WHITE:  Correct.

12        MR. THARP:  You said you were

13    stopped because of your car, you were

14    profiled because you are African-American

15    and young?

16        PROSPECTIVE JUROR WHITE:  Correct.

17    I was stopped once.  There was a

18    policeman pulled behind me.  I knew he

19    was behind me, sure not to do anything.

20    He followed me a mile and-a-half, pulled

21    me over, shined a light in my car, said I

22    was driving erratically.  I knew he was

23    behind me.  I knew I wasn't driving

24    erratically.

25        MR. THARP:  You weren't charged?

1      PROSPECTIVE JUROR WHITE:  I wasn't

2   charged.

3          MR. THARP:  You didn't have any

4   drugs in your car at that time?

5          PROSPECTIVE JUROR WHITE:  No.

6          MR. THARP:  Not saying you would.

7   You didn't?

8          PROSPECTIVE JUROR WHITE:  No.

9          MR. THARP:  Not driving OVI?

10         PROSPECTIVE JUROR WHITE:  No.

11         MR. THARP:  You don't believe you

12   were speeding?

13         PROSPECTIVE JUROR WHITE:  Sure I

14   wasn't.

15         MR. THARP:  You would have been

16   given a ticket or warrant.

17         In this case we are alleging the

18   defendant had drugs in his car.  Does

19   that change your opinion?  In this case,

20   he had drugs in his trunk.  Does that

21   change your opinion?  If police officers

22   can be right, can they pull the correct

23   person over?

24         PROSPECTIVE JUROR WHITE:  I guess.

25   I feel if they don't have a real reason

1    to pull over a person unless they have --

2    I don't know how they can say, based on

3    looking at this person or looking at that

4    person, this person has drugs.

5         MR. THARP:  You are exactly right.

6    That's an important point.  What if a

7    person did commit a traffic violation and

8    were pulled over for that?  Based on

9    that, they found drugs.  What would you

10   think of that?

11        PROSPECTIVE JUROR WHITE:  That's

12   fine.

13        MR. THARP:  Way it is?

14        PROSPECTIVE JUROR WHITE:  Right.

15        MR. THARP:  That's what the State

16   will allege.  Is that good with you?

17        PROSPECTIVE JUROR WHITE:  Fine.

18        MR. THARP:  If the State is able to

19   prove that beyond a reasonable doubt,

20   what would you say?

21        PROSPECTIVE JUROR WHITE:  Cool with

22   that.

23        MR. THARP:  Would you be able to

24   convict?

25        PROSPECTIVE JUROR WHITE:  Yes.

1      MR. THARP:  The Judge touched on, I

2      believe, does anyone have a particular

3      political or religious belief that would

4      prevent them from sitting in judgment of

5      another?  Anybody go to a certain church

6      that would not allow you to judge, judge

7      not lest ye be judged.  It is a heavy

8      burden to judge someone.  Is everyone

9      here willing to do that?  I usually say

10     this, I have to tell you, it is not fair

11     to ask questions without telling you

12     about myself.

13          I grew up in Louisville, Kentucky.

14     I moved here for law school.  I was

15     planning on going back.  I went out one

16     evening and ran into a young lady.

17     Suddenly, things changed while I have

18     been staying here.

19          I have been doing this 11 years

20     now.  I have worked in the office longer

21     than that.  I am a talker.  I speak too

22     fast.  I apologize.  Almost every trial,

23     I drop something.  Just because sometimes

24     the prosecution is clumsy does not mean a

25     person is not guilty.  Everyone agree?

1    Anybody here watch CSI?  Everybody
2    here familiar with the show, CSI?  It has
3    created a weird situation with the jury
4    sometimes.
5    This isn't a magic show.  We are
6    not going to have lasers and fog
7    machines.  We are not going to
8    fingerprint water and do all kind of
9    things.  So neat.  We all wish that was
10    available.
11    There is a little bit of CSI.  We
12    had drugs sent to the lab to be weighed
13    and identified.  Other than that, we will
14    not present any neat technical things.
15    No DNA.  No fingerprints.  Everybody
16    comfortable with that? Everybody
17    understand?  What we will have is regular
18    police work.  Everybody okay with that?
19    Let's talk about drugs.  Is anybody here
20    of the opinion that all drugs should be
21    legal for everyone?  There are a couple
22    states, a bunch of states that have said,
23    okay, in our state, Colorado, Washington,
24    maybe Washington, D.C. as well, those
25    states can smoke marijuana.  Anybody

1   agree or hope for that here?  Anybody
2   have a strong feeling at all?  We got
3   nothing.  Okay.
4        Let's back this up.  Here in Ohio,
5   this isn't dealing with marijuana.  We
6   are dealing with heroin.  Heroin is a
7   really powerful drug.  I don't know if
8   all of you are aware it has become a
9   problem in our community.  Does everyone
10  here agree heroin should be outlawed?
11  Anyone agree it should not be?
12       At the end of the trial, the Judge
13  said we will ask you to follow the law
14  whether you agree with it or not.  State
15  believes it will be beyond a reasonable
16  doubt that the defendant is guilty,
17  violated this law of heroin.  Does the
18  fact it involves drugs cause a problem?
19  Everybody is okay with the drug law in
20  Ohio as it is now?  Anybody have a
21  problem with it?
22       THE COURT:  Is this a good time to
23  take a short break I need?
24       MR. THARP:  Sure, Judge.
25       THE COURT:  Why don't we do that.

```
 1          I apologize.  I will be next door.

 2              First of all, don't talk about the

 3      case.  You don't know about the case, but

 4      you have heard this admonition a number

 5      of times.  Forget about anything you have

 6      heard so far.  Don't talk about the case.

 7      You can talk about Frazier winning the

 8      home run derby.

 9              Don't talk about the case.  By 2:15

10      I will be back over here, get you back

11      in, keep this moving along in Judge

12      Martin's room.  We will take a short

13      recess.  Hang around.  I won't talk.  I

14      will walk through.

15              Have you been back to my jury room

16      yet?  Probably out in the hall.

17              Emily, since Chris isn't here, is

18      going to take you back to the jury room.

19      Hang out there for a little bit and we

20      will get back to you.

21              Thank you very much.  Don't have to

22      go in any order.  Come up and go out this

23      door here.

24              (Prospective jurors left the

25      courtroom.)
```

1    THE COURT:  Please be seated.  Let

2    the record reflect the jury left the

3    courtroom.

4        Anything for the record?

5        MR. JACKSON:  No.

6        THE COURT:  Mr. Tharp?

7        MR. THARP:  No.

8        THE COURT:  Thank you for your

9    patience.  Be back at quarter after.

10       (A break was taken.)

11       (Prospective Jurors entered the

12   courtroom.)

13       THE COURT:  Thank you for that

14   accommodation.  I appreciate it.

15   Unfortunately, I didn't get to watch the

16   swearing in because lawyers were talking

17   and they went on, and on, and on.  It was

18   very nice of you.  I did forget --

19   apologize -- it is in my stuff to tell

20   you later.  During the course of this

21   trial, you are not allowed to talk to

22   anybody involved, any witnesses, any

23   parties, anybody involved.  So I have to

24   ask of you all, did anybody talk to

25   anybody, the lawyers, witnesses, people

1     involved, anybody in the audience during

2     our break?  Anybody do that?

3          I will admonish you later.  There

4     are a whole bunch of admonitions I have

5     to tell you about.  During the course of

6     this, those selected to be the jurors,

7     what you hear from this witness stand in

8     the courtroom and the law I give to you,

9     that's what you make your decision on.

10    To be talking to other people might cause

11    a problem.

12          Anything on that, Mr. Tharp?

13          MR. THARP:  Nothing, Your Honor.

14          THE COURT:  Mr. Jackson?

15          MR. JACKSON:  No, Your Honor.

16          THE COURT:  Thank you all very

17    much.  Apologize for not telling you

18    about that earlier.

19          With that, Mr. Tharp.

20          MR. THARP:  Good afternoon again.

21    The Judge said lawyers go on and on.  I

22    will say this.  The State has the burden

23    of reasonable doubt.  I am not going to

24    get into reasonable doubt too much.  It

25    is not my job.  It is job of the Judge to

1    explain reasonable doubt.  It is the

2    highest burden of proof we have in our

3    legal system.  It is not beyond a shadow

4    of a doubt.  Basically, it means what

5    would you make your most important

6    decisions on.  Would you get married to

7    this person.  Would you buy this house.

8    Not no doubt, no reasonable doubt.

9    Beyond a reasonable doubt.  That's a high

10   burden.  This is not an easy job.  It is

11   hard to convince people where you are

12   going to lunch, much less convict of a

13   crime.

14        But I will tell you that's what we

15   believe we are going to do.  The burden

16   is on us.  Defense doesn't have to say a

17   word.  Great, right?  They don't have to

18   present any evidence.  They don't have to

19   ask a question or do anything.  The

20   burden is on the State.  That's why the

21   State goes first.

22        As the Judge cut down on a lot of

23   questions he may have had, I cut down on

24   a lot of questions.  It takes longer for

25   me.  We talked about, this is really two

```
1      drug charges.

2           Ladies and gentlemen, this is a

3      serious matter.  The Judge will give an

4      instruction, probably a small one, you

5      are not to have sympathy or bias for

6      either party.  But this is a serious

7      matter.  You are not to consider

8      punishment or that type of thing.

9           There will be a lot of

10     instructions.  Is everybody prepared?

11     This is the highest trial court in Ohio,

12     the great State of Ohio.  Is everyone

13     comfortable with the seriousness of this

14     matter?  It is not a murder, nothing

15     violent.  This is a super serious matter.

16     Everyone understand the gravity of the

17     situation?  Everyone comfortable judging

18     someone in that situation?

19          Now, I tried and tried to come up

20     with a better way to do this, but I

21     can't, to keep my mind clear.  I will ask

22     you each individual questions.  I will

23     start off with Mr. Sterwerf.

24          At least maybe four, five tickets?

25          PROSPECTIVE JUROR STERWERF:
```

```
1              Something like that.
2              MR. THARP:  You have never been on
3      a jury before?
4              PROSPECTIVE JUROR STERWERF:  No.
5              MR. THARP:  Never been involved in
6      the judicial process at all?
7              PROSPECTIVE JUROR STERWERF:  No.
8              MR. THARP:  You said here on your
9      questionnaire police officers are good
10     people, you believe.
11             PROSPECTIVE JUROR STERWERF:  Sure.
12             MR. THARP:  Can a police officer
13     makes mistakes?
14             PROSPECTIVE JUROR STERWERF:
15             Absolutely.
16             MR. THARP:  Are they regular
17     people?
18             PROSPECTIVE JUROR STERWERF:  Yeah.
19             MR. THARP:  I agree.  The Judge
20     will instruct all of you, should you stay
21     on the jury, how to judge someone's
22     credibility.  You are not to give police
23     officers any more credibility just
24     because they are wearing a badge, but
25     even though they are police officers, can
```

1          someone judge them with the same level,

2          but a higher standard?  Can everyone do

3          that?  Will everyone promise to do that?

4               I can tell you State's case relies

5          on police officers' testimony.  There is

6          a video we are oping to play.

7          Occasionally, in the middle of trial, a

8          computer won't work, but that's what we

9          are expecting to do.  Everybody

10         understand that?

11              Ball State; I have visited there.

12         Neat campus.  David Letterman.  At the

13         time you filled this out, you did not

14         want to be a juror, correct?

15              PROSPECTIVE JUROR STERWERF:  Yes.

16              MR. THARP:  Do you still feel that

17         way?

18              PROSPECTIVE JUROR STERWERF:  No,

19         probably not.

20              MR. THARP:  Would you like to be a

21         juror?

22              PROSPECTIVE JUROR STERWERF:  Yes.

23              MR. THARP:  Can you be a fair and

24         impartial juror?

25              PROSPECTIVE JUROR STERWERF:  Yes.

1          MR. THARP:  What are you going to

2      base your decision on at the end of the

3      trial?

4          PROSPECTIVE JUROR STERWERF:  Facts.

5          MR. THARP:  The evidence presented?

6          PROSPECTIVE JUROR STERWERF:  Yes.

7          MR. THARP:  Nothing outside?

8          PROSPECTIVE JUROR STERWERF:

9      Correct.

10          MR. THARP:  Can you hear this case

11      fairly and impartially for both sides,

12      the defense and the State?

13          PROSPECTIVE JUROR STERWERF:  Yes.

14          MR. THARP:  If, in fact, the State

15      proves the case beyond a reasonable

16      doubt, will you be able to convict?

17          PROSPECTIVE JUROR STERWERF:  Yes.

18          MR. THARP:  Thank you.

19          Mr. Williams, I spoke to you a

20      little bit.  You were in broadcasting,

21      went to something else?

22          PROSPECTIVE JUROR WILLIAMS:

23      Correct.  Right out of high school

24      I went to Ohio Center for Broadcasting

25      School.  WARM 98.  That's still a radio

1    station.  Did a bit of that.

2         Once I graduated, it was determined

3    it was more understood how difficult it

4    is to break into that industry.  I felt

5    at the time, I had a small child, I was a

6    high school dad.  I had to keep things

7    going in the direction of providing

8    versus what I actually wanted to do so

9    that direction changed in my life all for

10   the better.  Not in broadcasting anymore,

11   unfortunately.

12        MR. THARP:  Did you want your own

13   radio show?

14        PROSPECTIVE JUROR WILLIAMS:  My

15   expertise was radio; specifically, on-air

16   personalities and production.

17        MR. THARP:  Never know what's going

18   to happen when you walk out the front

19   door.  So that's great.  You have spoken

20   about your other matter.  You were a

21   victim of a crime; is that correct?

22        PROSPECTIVE JUROR WILLIAMS:

23        Correct.

24        MR. THARP:  Was that able to come

25   to a conclusion?  Was it solved, for lack

1     of better term?

2          PROSPECTIVE JUROR WILLIAMS:  The

3     identity theft situation.  I wouldn't say

4     it was solved in regards to somebody

5     getting blamed for their actions for the

6     actual criminality part, but it was

7     resolved.  I can say that, as far as

8     personal information and credit

9     reporting, that was taken care of.

10         MR. THARP:  I know.  It stinks.

11    The police weren't involved in that

12    matter?

13         PROSPECTIVE JUROR WILLIAMS:  The

14    only time police were involved is, I was

15    required by Direct TV because it was

16    against one of their employees or

17    contractors, it was thought to be that's

18    how it originated.  Anyway, I did have to

19    create a police report for Direct TV and

20    for creditors.

21         MR. THARP:  At the time, you didn't

22    go to Court?

23         PROSPECTIVE JUROR WILLIAMS:  No.

24         MR. THARP:  Are you a member of the

25    Greater Cincinnati Aquarium Society?

1      PROSPECTIVE JUROR WILLIAMS:  I am.

2          MR. THARP:  You are the first

3      person I met who is.  Tell me about that.

4          PROSPECTIVE JUROR WILLIAMS:  Well,

5      all it is is a local club of hobbyists,

6      basically, for fish tanks, fish and

7      saltwater/freshwater fish.

8          MR. THARP:  Do you have a bunch of

9      tanks?

10         PROSPECTIVE JUROR WILLIAMS:  I do.

11     Currently, I do.  One is 220 gallons.

12     The other is a 20-gallon fish tank.  At

13     any time I could have a thousand gallons

14     of tanks going.  Kind of scaling it down

15     now.

16         MR. THARP:  You believe you would

17     be a fair juror because you believe in

18     fairness and equality; is that correct?

19         PROSPECTIVE JUROR WILLIAMS:

20         Correct.

21         MR. THARP:  You understand we are

22     in the fairness and equality business.

23     What I mean is, I am not allowed, let's

24     say, to prejudice someone but I am trying

25     to present facts that prove a person's

```
1        guilt.  You understand that that may not
2        seem fair, but that's the way it is.  If
3        it is done legally, someone has done
4        something wrong, that's how you prove
5        something, if the Judge allows things in.
6        Can you hear this case fairly and
7        impartially without bias?
8             PROSPECTIVE JUROR WILLIAMS:  Yes.
9             MR. THARP:  Will you do that?
10            PROSPECTIVE JUROR WILLIAMS:  Yes.
11            MR. THARP:  Understand the
12       difference there, what I mean?
13            PROSPECTIVE JUROR WILLIAMS:  I do.
14            MR. THARP:  Okay.  Mr. Williams,
15       thank you.  Appreciate it.
16            Is it Ms. Felss?  Hi.  How are you?
17            PROSPECTIVE JUROR FELSS:  I am
18       good.  How are you?
19            MR. THARP:  Haven't heard much from
20       you.  Is that good or bad?
21            PROSPECTIVE JUROR FELSS:
22            Probably good.
23            MR. THARP:  You have never been
24       involved in the judicial system at all;
25       is that correct?
```

1           PROSPECTIVE JUROR FELSS:  Domestic

2     relations when I was divorced, but not

3     this.

4           MR. THARP:  This is different.

5     Rules are different.

6           PROSPECTIVE JUROR FELSS:  Yes.

7     That's why I didn't put it down.

8           MR. THARP:  You have never been a

9     juror before?

10          PROSPECTIVE JUROR FELSS:  Correct.

11          MR. THARP:  You have a relative who

12    is president of Sprinkles.  What's

13    Sprinkles?

14          PROSPECTIVE JUROR FELSS:  It is a

15    cupcake company located in Los Angeles

16    and she is president and we are trying to

17    move the business eastward.

18          MR. THARP:  Hadn't heard of that.

19    Hopefully, I will soon.

20          PROSPECTIVE JUROR FELSS:  I hope

21    so.  I keep asking when will it come to

22    Cincinnati.  Great company.

23          MR. THARP:  Sounds like they will

24    do well.  In reading your questionnaire,

25    you believe you would be a good juror.

1    Do you believe that?

2         PROSPECTIVE JUROR FELSS:  Yes.

3         MR. THARP:  What do you base your

4    decision on?

5         PROSPECTIVE JUROR FELSS:  Based on

6    the information presented through the

7    trial.

8         MR. THARP:  At this point today,

9    has there been any evidence presented?

10        PROSPECTIVE JUROR FELSS:  No.

11        MR. THARP:  Without that evidence,

12   as we sit right now, the defendant

13   himself, I can tell you right now, is not

14   guilty.

15        PROSPECTIVE JUROR FELSS:  Correct.

16        MR. THARP:  Does everyone

17   understand why?  There will be no

18   evidence of his guilt presented.  I have

19   to tell you.  We believe we will present

20   that evidence right now prior to that

21   evidence going on.  Does everyone

22   understand that's the deal?  So, based on

23   that evidence, should the State present

24   that evidence the defendant is guilty

25   beyond a reasonable doubt, would you be

1    able to convict?

2         PROSPECTIVE JUROR FELSS:  Yes.

3         MR. THARP:  Can you sit in judgment

4    of another?

5         PROSPECTIVE JUROR FELSS:  Yes.

6         MR. THARP:  Ms. Morrison.

7         PROSPECTIVE JUROR RAMAHI:  Ramahi

8    is my married name.

9         MR. THARP:  You came on as Ms.

10   Morrison?

11        PROSPECTIVE JUROR RAMAHI:  Yes.  I

12   updated that with the Board of Elections.

13   I didn't know it was different.

14        MR. THARP:  You have never been a

15   juror before.  Do you have some family

16   members who were victims of crime?

17        PROSPECTIVE JUROR RAMAHI:  Yes.

18        MR. THARP:  Were police involved in

19   those matters?

20        PROSPECTIVE JUROR RAMAHI:  Yes.

21        MR. THARP:  Sounds like none of

22   those events were satisfactory.

23   Particularly with your husband.

24        PROSPECTIVE JUROR RAMAHI:  Correct.

25        MR. THARP:  Were police able to

```
 1        make an arrest in any of those matters?

 2             PROSPECTIVE JUROR RAMAHI:  No,

 3        wasn't any fault of the police.  It was

 4        the perpetrators in the cases.

 5             MR. THARP:  There was no closure

 6        for you on those matters?

 7             PROSPECTIVE JUROR RAMAHI:

 8             Correct.

 9             MR. THARP:  Sorry to hear that.

10        Police were involved.  Do you have a bias

11        against or for police based on that?

12        Your interaction was satisfactory and

13        okay?

14             PROSPECTIVE JUROR RAMAHI:  Correct.

15             MR. THARP:  Did they do their job?

16             PROSPECTIVE JUROR RAMAHI:

17        Absolutely.

18             MR. THARP:  Sometimes they might

19        not do their job?

20             PROSPECTIVE JUROR RAMAHI:  I am

21        sure sometimes they don't.

22             MR. THARP:  In this case, we will

23        say the police did their job.  Are you

24        comfortable with that?

25             PROSPECTIVE JUROR RAMAHI:  Yes.
```

1     MR. THARP:  Do you have bias for or

2   against police based on your interaction?

3     PROSPECTIVE JUROR RAMAHI:  No.

4     MR. THARP:  When you filled out

5   your questionnaire some time ago, you

6   believed you would not be a good juror.

7     PROSPECTIVE JUROR RAMAHI:  Correct.

8     MR. THARP:  Based on everything

9   you have heard here, what the case is

10   about, you heard a little bit what it is

11   about, do you think you might change your

12   mind?

13     PROSPECTIVE JUROR RAMAHI:  I think

14   so.  I think I made that decision

15   thinking if it had to do with children.

16   I think I could be fair.

17     MR. THARP:  Could you be fair and

18   impartial?

19     PROSPECTIVE JUROR RAMAHI:  Yes.

20     MR. THARP:  Fair to the defense?

21     PROSPECTIVE JUROR RAMAHI:

22   Absolutely.

23     MR. THARP:  Fair to the State?

24     PROSPECTIVE JUROR RAMAHI:

25   Absolutely.

53

1          MR. THARP:  If you remain on the

2     jury, you will go back to the jury room,

3     follow instructions.  At that time, you

4     will have your own individual thought of

5     guilt or innocence.  The Judge will

6     direct you how you will work together.

7          Understand that?

8          PROSPECTIVE JUROR RAMAHI:  Yes.

9          MR. THARP:  Now, you are not to

10     walk in with pride or an idea of what

11     happens and not listening.  At the end of

12     our discussions, if you believe the

13     defendant is guilty and no one else does,

14     would you stay with that?

15          PROSPECTIVE JUROR RAMAHI:

16     Absolutely.

17          MR. THARP:  But if you believe the

18     opposite, he is not guilty and everyone

19     else believes he is guilty, would you

20     stay with that?

21          PROSPECTIVE JUROR RAMAHI:  Yes.

22          MR. THARP:  Would you make your

23     decision based on facts and evidence as

24     opposed to emotion?

25          PROSPECTIVE JUROR RAMAHI:  Yes.

1      MR. THARP:  Are you sure you can do

2      that?

3          PROSPECTIVE JUROR RAMAHI:  Yes.

4          MR. THARP:  Thank you.

5          Good afternoon, Ms. Harlow.  How

6      are you today?

7          PROSPECTIVE JUROR HARLOW:  Good.

8          MR. THARP:  I am a talker.  Have

9      you been able to hear me?

10         PROSPECTIVE JUROR HARLOW:  Gets a

11     little low.  I have been trying.  Are you

12     comfortable you will be able to hear

13     everything during the trial?

14         PROSPECTIVE JUROR HARLOW:  Yes.  I

15     can have my hearing aid adjusted.

16         MR. THARP:  Do you believe that

17     will help you?

18         PROSPECTIVE JUROR HARLOW:  Yes.

19         MR. THARP:  Comfortable sitting

20     here a couple days listening to the

21     evidence?

22         PROSPECTIVE JUROR HARLOW:  Yes.

23         MR. THARP:  You have never been a

24     juror before.  Ever been called?

25         PROSPECTIVE JUROR HARLOW:  I was

```
 1           called, didn't sit on a jury.
 2               MR. THARP:  Ever sit in a situation
 3           like this where you were questioned?
 4               PROSPECTIVE JUROR HARLOW:  Yes, it
 5           was about 30 years ago, or so.  I had
 6           been involved with a sexual assault case
 7           with one of my children, so I was
 8           excused.
 9               MR. THARP:  I am sorry.  Have you
10           been involved in the criminal justice
11           system through your family, then?
12               PROSPECTIVE JUROR HARLOW:  Juvenile.
13               MR. THARP:  Based on that
14           situation, are you going to judge this
15           impartially?
16               PROSPECTIVE JUROR HARLOW:  Yes.
17               MR. THARP:  For or against the
18           State?
19               PROSPECTIVE JUROR HARLOW:
20               Depending on the evidence
21           presented.  I would be able to make the
22           decision.
23               MR. THARP:  Will you make the
24           decision on evidence presented, if any?
25               PROSPECTIVE JUROR HARLOW:
```

1    Absolutely.

2    MR. THARP:  You were involved in a

3    lawsuit, a civil lawsuit; is that

4    correct?

5    PROSPECTIVE JUROR HARLOW:  My

6    grandson was struck and killed by a bus.

7    MR. THARP:  So sorry to hear that,

8    ma'am.  That was a civil matter?

9    PROSPECTIVE JUROR HARLOW:  Yes.

10    MR. THARP:  Rules are different,

11    everything is different.  Did that go to

12    trial?

13    PROSPECTIVE JUROR HARLOW:  Did not

14    go to court.

15    MR. THARP:  Obviously, this is

16    different.  You understand?  Will that

17    situation have any bearing on your

18    decision here?

19    PROSPECTIVE JUROR HARLOW:  No.

20    MR. THARP:  You believe at the time

21    you filled out the questionnaire, you

22    would be a fair and impartial juror; is

23    that the same?

24    PROSPECTIVE JUROR HARLOW:  Yes.

25    MR. THARP:  Say you are

```
 1        open-minded?
 2             PROSPECTIVE JUROR HARLOW:
 3             Absolutely.
 4             MR. THARP:  We are going to ask you
 5        to take a small moment in time here from
 6        last year and judge what happened that
 7        day.  We'll have you look at a certain
 8        set of facts.  Are you comfortable with
 9        that?
10             PROSPECTIVE JUROR HARLOW:  Yes.
11             MR. THARP:  Ms. Harlow, thank you.
12             Ms. Richter, hi.  Haven't heard
13        much from you.  Is that good or bad?
14             PROSPECTIVE JUROR RICHTER:  Should
15        be good.
16             MR. THARP:  I am sure it is.  What
17        area of town is the place where your work
18        is located?
19             PROSPECTIVE JUROR RICHTER:  Where I
20        work is Glendale.
21             MR. THARP:  I thought it was a
22        school I was familiar with.  It is not
23        the same.
24             Never been a juror before?
25             PROSPECTIVE JUROR RICHTER:  Never.
```

1       MR. THARP:  Never been involved in

2    the judicial system, correct?

3       PROSPECTIVE JUROR RICHTER:  Other

4    than my husband.

5       MR. THARP:  Excuse me.  That's a

6    civil matter?

7       PROSPECTIVE JUROR RICHTER:  Yes.

8       MR. THARP:  Ongoing civil matter?

9       PROSPECTIVE JUROR RICHTER:  It is.

10      MR. THARP:  That's a civil matter.

11      PROSPECTIVE JUROR RICHTER:  I do

12   understand.

13      MR. THARP:  Totally different.

14   Would that have any bearing?

15      PROSPECTIVE JUROR RICHTER:  Bearing

16   it would have is, the person suing us is

17   a police officer.  If I would be honest,

18   I would say 60 percent/40 percent in

19   terms of police officers at this point.

20      MR. THARP:  Does that create a

21   problem with hearing testimony of police

22   officers?

23      PROSPECTIVE JUROR RICHTER:

24      Slightly, yes.

25      MR. THARP:  Does that mean all

```
 1          police officers are bad?

 2                PROSPECTIVE JUROR RICHTER:

 3                Absolutely not.  My father-in-law

 4          was a great police officer.

 5                MR. THARP:  You happened to have a

 6          situation with one who was not?

 7                PROSPECTIVE JUROR RICHTER:  Who

 8          takes advantage of the position, yes.

 9                MR. THARP:  Thank you.  Do you

10          think you think you can hear this

11          impartially?

12                PROSPECTIVE JUROR RICHTER:  I do.

13          Does not have anything to do with the

14          other.

15                MR. THARP:  Mr. Standiford, how are

16          you?

17                PROSPECTIVE JUROR STANDIFORD:  Fine.

18                MR. THARP:  Could you hear this

19          fairly and impartially?

20                PROSPECTIVE JUROR STANDIFORD:  Yes.

21                MR. THARP:  What would you make the

22          decision on?

23                PROSPECTIVE JUROR STANDIFORD:

24                Evidence and instructions from the

25          Judge.
```

1      MR. THARP:  Anything else?

2          PROSPECTIVE JUROR STANDIFORD:  No.

3      MR. THARP:  Great.  Never been a

4   juror before?

5          PROSPECTIVE JUROR STANDIFORD:  No.

6      MR. THARP:  Never been involved in

7   the judicial system at all?

8          PROSPECTIVE JUROR STANDIFORD:  No.

9      MR. THARP:  All these questions

10  about police officers, quite frankly,

11  most all the witnesses we have happen to

12  be police officers in this case.  You are

13  neutral.  What do you mean by neutral?

14         PROSPECTIVE JUROR STANDIFORD:  I

15  think I have an understanding what police

16  are involved with.  A close friend of

17  mine was a police officer.  That is a

18  tough job.

19     MR. THARP:  I highly agree with you

20  there.  What does that mean, tough job?

21  How would that affect your thinking in

22  this matter?

23         PROSPECTIVE JUROR STANDIFORD:  To

24  be open that a police officer can't save

25  the world, just the way a judge or a

1        lawyer can't save the world.  Life is not

2        always black and white.

3            MR. THARP:  In this case, we are

4        hoping to produce straightforward facts.

5        Can sometimes facts be straightforward?

6        Can A plus B equals C, sometimes?

7            PROSPECTIVE JUROR STANDIFORD:  Not

8        sure about the answer to that question.

9        I am sure the facts can be

10       straightforward.

11           MR. THARP:  Would you be

12       comfortable in a drug case?

13           PROSPECTIVE JUROR STANDIFORD:  Yes.

14           MR. THARP:  You believe you could

15       be a fair and impartial juror?

16           PROSPECTIVE JUROR STANDIFORD:  Yes.

17           MR. THARP:  Believe that?

18           PROSPECTIVE JUROR STANDIFORD:  Yes.

19           MR. THARP:  Follow the law even if

20       your personal feelings don't agree with

21       the law?

22           PROSPECTIVE JUROR STANDIFORD:  Yes.

23           MR. THARP:  I asked everyone

24       earlier about the laws we are dealing

25       with here.  Are you comfortable with

1    those laws?

2        PROSPECTIVE JUROR STANDIFORD:  Yes.

3        MR. THARP:  Thank you.

4        Ms. Wilcox, good afternoon.

5        Went to UC.  Never been a juror

6    before?

7        PROSPECTIVE JUROR WILCOX:  Correct.

8        MR. THARP:  Never been involved in

9    the judicial system, but your car was

10   broken into?

11       PROSPECTIVE JUROR WILCOX:  I have

12   been involved in the judicial system.  I

13   have been a witness.

14       MR. THARP:  What type of case?

15       PROSPECTIVE JUROR WILCOX:  Sexual

16   assault case.  I am a sexual assault

17   nurse examiner.

18       MR. THARP:  I meant personally.

19       PROSPECTIVE JUROR WILCOX:  No, just

20   professionally.

21       MR. THARP:  Sorry.  Should have

22   picked up on that.  Sorry.  Okay.  Your

23   situation there with your employment,

24   think that will create a bias for you?

25       PROSPECTIVE JUROR WILCOX:  No.

1        MR. THARP:  I wouldn't think so.  I

2   have to ask, do you serve as a witness

3   occasionally in court?

4        PROSPECTIVE JUROR WILCOX:  Yes.

5        MR. THARP:  How many times have you

6   been a witness?

7        PROSPECTIVE JUROR WILCOX:  About

8   four times.

9        MR. THARP:  You are comfortable

10  here?

11       PROSPECTIVE JUROR WILCOX:  No.

12       MR. THARP:  Makes you less

13  comfortable?

14       PROSPECTIVE JUROR WILCOX:  Yes.

15       MR. THARP:  This is going to be

16  about it for questions for you.  Why are

17  you not comfortable here?

18       PROSPECTIVE JUROR WILCOX:  I am

19  more comfortable in the hospital doing my

20  job.

21       MR. THARP:  Burden to be here?

22       PROSPECTIVE JUROR WILCOX:  Not a

23  burden, just uncomfortable.

24       MR. THARP:  As the Judge said, this

25  is a situation, it is important, it is

1     very serious.  This is not a violent

2     situation.  The work you do -- we will

3     not have that type of stuff.  Still not

4     comfortable?

5          PROSPECTIVE JUROR WILCOX:  Not

6     really.

7          MR. THARP:  Do you want to be here?

8          PROSPECTIVE JUROR WILCOX:  It is

9     okay.

10         MR. THARP:  Will you hear the facts

11     fairly and impartially if you stay on the

12     jury?

13         PROSPECTIVE JUROR WILCOX:  Yes.

14         MR. THARP:  You thought you would

15     be a good juror.  Do you still think

16     that?

17         PROSPECTIVE JUROR WILCOX:  Uh-huh.

18         MR. THARP:  Does anybody just

19     really not want to be here?  I mean,

20     honestly.  Sometimes people get a

21     postcard, oh, no, why?  Anybody feel

22     that?  See, that's honest.  Does everyone

23     understand when I say this is the

24     greatest system in the world.  It is such

25     a great honor and duty, it is so

```
 1        important.  Does everyone understand the
 2        gravity?
 3              I don't believe this case probably
 4        ever would or has made the paper or
 5        national headlines.  It doesn't make it
 6        less important.  Everybody comfortable
 7        being here for this trial?  Sorry.  It
 8        really struck a chord.
 9              You have been a victim of a crime?
10              PROSPECTIVE JUROR WILCOX:  Yes.
11              MR. THARP:  Car was broken into.
12        Is that all?
13              PROSPECTIVE JUROR WILCOX:  Yeah.
14        It has been broken into a couple times.
15              MR. THARP:  I understand.  Police
16        involved, anything involved?
17              PROSPECTIVE JUROR WILCOX:  Not
18        anything involved.  Police involved.
19              MR. THARP:  Ms. Wilcox, although it
20        seems like you may not want to be here,
21        are you comfortable being here?
22              PROSPECTIVE JUROR WILCOX:  I am all
23        right working outside my comfort zone.
24              MR. THARP:  Comfortable if you stay
25        here?
```

```
1              PROSPECTIVE JUROR WILCOX:

2              Absolutely.

3              MR. THARP:  Ms. Wilcox, thank you.

4              Ms. Johnson, how are you?

5              PROSPECTIVE JUROR JOHNSON:  I am

6       fine.

7              MR. THARP:  Graduated from Xavier?

8              PROSPECTIVE JUROR JOHNSON:  Didn't

9       graduate yet.

10             MR. THARP:  Still attending?

11             PROSPECTIVE JUROR JOHNSON:  Yes.

12             MR. THARP:  That's great.  Rude to

13      ask you, you are 20 years old.  You

14      already got called for jury duty?  Should

15      buy a lottery ticket.  Some people wait

16      forever.  I never even get called.

17      That's great.  You have never been called

18      as a juror before.  That would be wild.

19      Never been involved in the judicial

20      system; is that correct?

21             PROSPECTIVE JUROR JOHNSON:  No.

22             MR. THARP:  Are you comfortable

23      being here?

24             PROSPECTIVE JUROR JOHNSON:  Yes.

25             MR. THARP:  Would you be fair and
```

1     impartial with both the State and
2     defense?
3          PROSPECTIVE JUROR JOHNSON:  Yes.
4          MR. THARP:  If the State produces
5     evidence beyond a reasonable doubt the
6     defendant is guilty, can you convict?
7          PROSPECTIVE JUROR JOHNSON:  Yes.  I
8     smile, naturally.
9          MR. THARP:  You have a beautiful
10    smile, so you should.  Are you
11    comfortable being here, doing that?
12         PROSPECTIVE JUROR JOHNSON:  Yes.
13         MR. THARP:  Okay.  Can you be fair
14    and impartial to both the State and
15    defense?
16         PROSPECTIVE JUROR JOHNSON:  Yes.
17         MR. THARP:  Thank you, Ms. Johnson.
18         Ms. Griffith, hi.  How are you?
19    You have been called?
20         PROSPECTIVE JUROR GRIFFITH:  Yes.
21         MR. THARP:  Did you get this far?
22         PROSPECTIVE JUROR GRIFFITH:  No.
23         MR. THARP:  Did you ever get into a
24    courtroom?  Sometimes people get called.
25         PROSPECTIVE JUROR GRIFFITH:  Yes.

1      MR. THARP:  How many times?

2      PROSPECTIVE JUROR GRIFFITH:  Once

3  in the courtroom.

4      MR. THARP:  Never been involved in

5  the judicial system?

6      PROSPECTIVE JUROR GRIFFITH:  That's

7  correct.

8      MR. THARP:  You have an opinion

9  about police officers.  Do you think that

10  will cause a bias for you?

11      PROSPECTIVE JUROR GRIFFITH:  I

12  don't.

13      MR. THARP:  Can you tell me why

14  that wouldn't create a bias?  Sounds

15  biased here.

16      PROSPECTIVE JUROR GRIFFITH:  I said

17  they can, sometimes.  I have run across

18  people that aren't that way and people

19  who are that way.  I had a couple

20  situations.  I may have said, I have

21  never been a victim of a crime.  Now that

22  I am sitting here, I can think of several

23  things that happened where the police

24  have been involved.

25      MR. THARP:  If you are comfortable

1    sharing, what type of things have come to

2    mind?

3              PROSPECTIVE JUROR GRIFFITH:  There

4    was a peeping tom where I lived.  I had

5    police officers come.  They were friendly

6    except for one, who was very arrogant.

7    It took a while to get his help.

8              MR. THARP:  Other than that?

9              PROSPECTIVE JUROR GRIFFITH:  Other

10   than that, that was the case.

11             MR. THARP:  Sorry to hear about

12   that bad interaction.  Will that create a

13   bias for you?

14             PROSPECTIVE JUROR GRIFFITH:  I

15   don't think so.

16             MR. THARP:  Do you expect every

17   officer who gets here will be nice or

18   arrogant?

19             PROSPECTIVE JUROR GRIFFITH:  They

20   are going to be who they are.

21             MR. THARP:  How will you judge

22   their credibility?

23             PROSPECTIVE JUROR GRIFFITH:  By

24   what they say and through demeanor.

25             MR. THARP:  The Judge will instruct

1   you also, use your common sense.

2         PROSPECTIVE JUROR GRIFFITH:  I

3   think so.

4         MR. THARP:  You believe you would

5   be a good juror?

6         PROSPECTIVE JUROR GRIFFITH:  I do.

7         MR. THARP:  Fair and impartial to

8   both sides?

9         PROSPECTIVE JUROR GRIFFITH:  Yes.

10         MR. THARP:  Sorry about the peeping

11   tom matter.  That's terribly scary.  Did

12   you find him?

13         PROSPECTIVE JUROR GRIFFITH:  I

14   don't believe so.  If they did, I didn't

15   hear about it.  Happened again.  I didn't

16   hear about it.  A neighbor told me they

17   saw somebody come out behind my house in

18   the middle of the night.  Not sure what

19   he was doing up in the middle of the

20   night.  But I haven't heard anything

21   since.  I got a dog, and that helped.

22         MR. THARP:  Thank you.  Sorry about

23   that situation.

24         Mr. Flukman, you are in civil

25   engineering?

1          PROSPECTIVE JUROR FLUKMAN:  yes.

2             MR. THARP:  Take a lot of

3      information, you have to sort it out, put

4      it in order, make things happen?

5          PROSPECTIVE JUROR FLUKMAN:  Yes.

6             MR. THARP:  This isn't that large a

7      trial.  Hopefully we will be able to

8      present a concise, direct case.  If

9      things get screwed up, will you be

10     comfortable with that?

11         PROSPECTIVE JUROR FLUKMAN:  Yes.

12           MR. THARP:  Just in 2012, you were

13     called as a juror?

14         PROSPECTIVE JUROR FLUKMAN:  Yes.

15     Just sitting there for two weeks about

16     four or five days ago.

17          MR. THARP:  Could be worse.  Is

18     that the only other time you have been

19     called?

20         PROSPECTIVE JUROR FLUKMAN:  That

21     was the only other time.

22          MR. THARP:  You had your vehicle

23     broken into?

24         PROSPECTIVE JUROR FLUKMAN:  Yes.

25          MR. THARP:  Called police, called

1     911?

2            PROSPECTIVE JUROR FLUKMAN:  Yes,

3     they came and dusted for fingerprints.

4            MR. THARP:  Never solved it?

5            PROSPECTIVE JUROR FLUKMAN:  No.

6            MR. THARP:  You had a civil

7     lawsuit?

8            PROSPECTIVE JUROR FLUKMAN:  Yes.

9            MR. THARP:  That was totally

10    different, understand, different rules,

11    different situations?

12           PROSPECTIVE JUROR FLUKMAN:  Yes.

13           MR. THARP:  Do you think you would

14    be a good juror?

15           PROSPECTIVE JUROR FLUKMAN:  Yes.

16           MR. THARP:  You stated you believe

17    justice needs to be served, I believe,

18    correct?

19           PROSPECTIVE JUROR FLUKMAN:  Yes.

20           MR. THARP:  What do you mean?

21           PROSPECTIVE JUROR FLUKMAN:  If I

22    said black or white, facts are there, it

23    is logical, involves the law, that's

24    justice.

25           MR. THARP:  If evidence is there

1    beyond a reasonable doubt.  If not, you

2    wouldn't convict?

3          PROSPECTIVE JUROR FLUKMAN:

4    Correct.

5          MR. THARP:  At the end of the

6    trial, if we ask you to go up or down?

7          PROSPECTIVE JUROR FLUKMAN:  Yes.

8          MR. THARP:  Thank you, sir.  You

9    can be fair and impartial?

10         PROSPECTIVE JUROR FLUKMAN:  Yes.

11         MR. THARP:  Mr. White, you spoke

12   earlier.  Without going into our previous

13   conversation, you stated earlier you did

14   not think you would be a good juror; is

15   that correct?

16         PROSPECTIVE JUROR WHITE:  Yes.

17         MR. THARP:  Not really interested.

18   Do you feel that way?

19         PROSPECTIVE JUROR WHITE:  Not that

20   I don't feel I would be a good juror.  It

21   is like I said earlier, I kind of feel a

22   way toward police officers, stuff like

23   that, but previously said there are good

24   people and bad people.

25         MR. THARP:  You believe you may

1    have a bias against police officers,

2    correct?

3         PROSPECTIVE JUROR WHITE:  Somewhat.

4         MR. THARP:  This is the second time

5    you brought that up in this form,

6    correct?  You don't think you could get

7    past that?

8         PROSPECTIVE JUROR WHITE:  I mean,

9    it is not even a bias.  I mean, if I am

10   driving, most people driving see a police

11   officer, they feel some type of way about

12   it, even if you are not doing anything

13   wrong, you know.

14        As far as police officers, I think

15   there are police officers that do their

16   job, they are good at it, they will help

17   you, if you are in need.

18        I feel there are others that take

19   advantage of their position, do things

20   that aren't necessary sometimes.

21        MR. THARP:  That's a belief you

22   have?

23        PROSPECTIVE JUROR WHITE:  Yes.

24        MR. THARP:  You can't get around

25   that?  That's fair, not right or wrong?

```
1              PROSPECTIVE JUROR WHITE:  Correct.

2              MR. THARP:  Judge, I move for

3      cause.

4              THE COURT:  At certain times during

5      the trial, the attorneys and myself need

6      to talk about things outside your

7      presence.  This is one of those times.

8      Part of the trial.

9              Stand up, stretch.  You are welcome

10     to do that.

11             (Discussion was held off the

12     record at side bar.)

13             MR. THARP:  Thank you.  I

14     appreciate that.  Thank you very much.

15             Ladies and gentlemen, thank you so

16     much for your attention.  I think

17     Mr. Jackson may have some questions for

18     you.  If he does, please show him the

19     same kind attention as you showed me.

20             Thank you very much.

21             With one exception, we would pass

22     for cause.

23             THE COURT:  Thank you very much.

24             Mr. Jackson, whenever you are

25     ready, sir.
```

1      MR. JACKSON:  Good afternoon.  Good

2  afternoon.  Apologize.  I am suppose to

3  direct comments here, but if I ask

4  someone a question, think about it.  If

5  you happen to get in the box, please

6  remind me, say, there is something you

7  want to address with me or Mr. Tharp.

8      My name is Kory Jackson.  It is my

9  honor to represent Jason Glenn in this

10  matter.

11      None of you served on a jury

12  before; is that correct?

13      I will start out, this is a long,

14  tedious process.  Quite frankly, what I

15  know about this trial, this may be the

16  longest process.  Bear with us.

17      Does anybody need to take a break?

18  Everybody okay to go a little longer?   I

19  will try to be as brief as I can.

20      So, this is a trial.  This is a

21  courtroom.  Mr. Tharp represents the

22  State.  I represent Mr. Glenn, but we are

23  all part of the system, what we call the

24  adversary system.

25      So adversarial means Mr. Tharp and

1    I are against each other.  We don't
2    dislike each other.  He is trying to
3    prove his case, like I am trying to
4    present my case as well.  In that sense,
5    we are on equal footing.  Does anybody
6    have a problem with my characterization
7    of that?  When we get to this point, when
8    we are in trial, he is working his
9    hardest to legally prove his case.  I am
10   doing the opposite.
11         It comes to you, as the jurors, to
12   make the decision.  You are the judges of
13   this case.  You judge the facts.  The
14   Judge will give you the law, but I would
15   disagree only slightly, that you are the
16   most important people in this room
17   because you determine whether Mr. Glenn
18   is guilty or innocent.
19         So, with that said, I urge you,
20   even though Mr. Tharp is the prosecutor,
21   as I said, we are equals in this case.
22   You have to judge the case he presents,
23   the quality of the evidence, the
24   witnesses that he presents, just like if
25   I present evidence or if I present

1    witnesses.

2          They are equals, except for your

3    determination of their credibility, the

4    determination of the quality of the

5    evidence.

6          Does anybody have a problem with

7    that?  So, in that sense, Mr. Tharp --

8    and Mr. Tharp and I don't disagree about

9    very much in this case.  But Mr. Tharp

10   stated to you, I believe, that he has the

11   burden of proof.  Does everybody recall

12   him saying that?  Does anybody have a

13   strong feeling about what that means?

14         Okay.  I will throw out a general

15   statement.  I don't think Mr. Tharp will

16   disagree with me that saying that he has

17   the burden of proof means that he has to

18   prove every element of this case beyond a

19   reasonable doubt.  I don't have to prove

20   anything.  Mr. Glenn doesn't have to

21   prove anything.  It is all up to Mr.

22   Tharp as a prosecutor in this case.  If

23   he doesn't prove one element beyond a

24   reasonable doubt or many elements beyond

25   a reasonable doubt, then you must find

1    Mr. Glenn not guilty.  Does anyone have

2    trouble with that?

3         Does that cause anybody any issues

4    if they were to serve on this jury?  What

5    that means, and I will break it down

6    further.  I don't have to present any

7    evidence.  I don't have to call

8    witnesses.  I don't have to ask any

9    questions, if I choose not to.

10        Even if I don't do any of those

11   things, you still, if you are called to

12   serve, have to determine whether Mr.

13   Tharp has put on a case that has provided

14   you with proof beyond a reasonable doubt.

15        So, is everybody okay with that

16   concept, generally?  And I would like to

17   touch upon reasonable doubt also.  The

18   judge will instruct you what reasonable

19   doubt is when we get to that point in the

20   trial towards the end.

21        I don't want to go too far into

22   what reasonable doubt means, but I do

23   feel sometimes people have a little bit

24   of trouble with that concept.  Does

25   anyone feel like they cannot apply or

1    cannot discern what reasonable doubt

2    means?

3         Question.  Ms. Wilcox, you said you

4    are a nurse who does sexual assault

5    cases.  Do you ever testify in what they

6    call Juvenile Court?

7         PROSPECTIVE JUROR WILCOX:  No.

8         MR. JACKSON:  Does anyone know

9    about cases where children are taken from

10   parents either from abuse or neglect?

11        This is Court of Common Pleas.

12   Court of Common Pleas covers a lot;

13   domestic relations, although not this

14   courtroom, is covered by Court of Common

15   Pleas.  So is Juvenile Court.

16        One of the things in Juvenile Court

17   is called dependency court when a parent

18   is determined to be neglectful or abusive

19   of children.  It can be determined that

20   child is a ward of the State.  That child

21   is dependent -- that's why it is called

22   dependency court -- on, really, the

23   County, Hamilton County, for protection,

24   sustenance, things like that.

25        So, in those situations, for the

government prosecutors who represent the
government in that case as well, before a
child can be taken from their parents and
sometimes permanently, they have to have
a trial, just like this, generally
without a jury.

In those cases, the standard the
judge or magistrate has to apply is
what's called clear and convincing
evidence. Is that magistrate or judge
convinced that this child is ultimately
being abused or neglected such that they
should be taken from the parent. To take
a child permanently from their parents is
below the standard you all have to apply
in this case. If clear and convincing
evidence is there, you can take a child
from their parent forever.

Proof beyond a reasonable doubt is
even higher. That's the proof. That is
what Mr. Tharp has to prove to you all
before you can find Mr. Glenn guilty.
Anyone have any problems with that
concept so far?

I will ask you to raise your hands,

1       show of hands, does anybody think that

2       there are a set of circumstances that

3       they may admit that they did something

4       that they did not do?  I see some people

5       coming on board.

6               Ms. Ramahi, what would be some

7       circumstances you can think of where you

8       would say you did something that you

9       didn't do?

10              PROSPECTIVE JUROR RAMAHI:  To be

11      honest, I was thinking of my kids when I

12      said yes.

13              MR. JACKSON:  That's a perfect

14      example.  Let's talk about that.  If

15      someone said they would do something bad

16      to your child, all you had to do was say,

17      I did something, would that be something

18      that would motivate you to do it, to say

19      you did it?

20              PROSPECTIVE JUROR RAMAHI:  Yes.

21              MR. JACKSON:  You care about your

22      children.  There is something that would

23      trigger in you the desire to protect your

24      children or to see them be taken care of

25      that you would be willing to say you did

85

1  something you didn't do for their

2  protection and well-being.

3        Does anybody else agree?  Anybody

4  have something similar?  I saw hands

5  before.  Mr. Standiford, you raised your

6  hand.  Is there something, if presented

7  to you, a set of circumstances came your

8  way, you may admit something you wouldn't

9  do.

10        PROSPECTIVE JUROR STANDIFORD:  I

11  wasn't thinking of myself.  I heard of

12  cases where a husband would take charge

13  if a wife did something.  Sometimes a

14  case where someone was terminally ill,

15  would take charge.

16        MR. JACKSON:  You were thinking of

17  another family member, a person someone

18  else may say they did someone they didn't

19  do for that person's protection?

20        PROSPECTIVE JUROR STANDIFORD:  I

21  have seen stories like that in TV shows.

22        MR. JACKSON:  Ms. Johnson.

23        PROSPECTIVE JUROR JOHNSON:  If

24  people are bribed.

25        MR. JACKSON:  If something is

1           offered of value to that person, that may

2           be something that makes them say they did

3           something they didn't do.  Anybody else

4           think of any scenarios?

5                Mr. White, you are contemplating.

6           Is there something you can think of?

7                PROSPECTIVE JUROR WHITE:  Basically,

8           what you said, where if it is something

9           of value, if I say I did something or

10           plea to a lesser, maybe if I say I did

11           it, I won't get as much of a crime.

12                MR. JACKSON:  I brought it

13           specifically to the court system.  To say

14           you did something you didn't do.

15                PROSPECTIVE JUROR WHITE:  To keep

16           from going all the way to trial.

17                MR. JACKSON:  I think I understand.

18                PROSPECTIVE JUROR JOHNSON:  Maybe

19           for, like, scared.

20                MR. JACKSON:  Maybe something

21           motivates you or someone else to say

22           something that they didn't do.  Has

23           anyone ever heard of a person claiming

24           that in trial they said they did

25           something but they really didn't do it?

1    MR. THARP: I object at this point

2    to a specific reference to a specific

3    instance in another trial.

4    THE COURT: I will overrule it at

5    this point.

6    MR. JACKSON: I want to be clear.

7    I am talking in generalities. Has anyone

8    heard of famous trials, not trials you

9    may have dealt with personally, but a

10   famous situation where a person at one

11   point said they committed a crime but

12   later said I did not do it, and said they

13   did it for specific reasons? Anybody

14   hear of the Central Park Five?

15   MR. THARP: Renew my objection

16   based on incident.

17   THE COURT: Citing a specific case?

18   MR. THARP: Specific case doesn't

19   have anything to do with this matter.

20   THE COURT: It is Voir Dire, ladies

21   and gentlemen. These are questions,

22   ultimately, you will be asked to decide

23   what occurred in this case. At this

24   point, I think it is okay.

25   MR. THARP: Thank you, Judge.

1          THE COURT:  Go ahead.

2          MR. JACKSON:  Ms. Wilcox, do you

3     recall the case, in general?

4          PROSPECTIVE JUROR WILCOX:  Vaguely.

5          MR. JACKSON:  What do you recall

6     about the case?

7          PROSPECTIVE JUROR WILCOX:  Don't

8     put me on the spot.

9          MR. JACKSON:  There were five

10     because there were five children, and

11     they were charged with a heinous crime.

12     It was a jogger in Central Park, Central

13     Park trial.  If you recall, correct me if

14     I am wrong, in that case, to a person

15     they said, I didn't do it, but when they

16     were interviewed, they said they did do

17     it.  Does everybody remember that?  Some

18     people remember.

19          Does anyone think that there are no

20     set of circumstances where they would say

21     they did something, that if they said

22     they did something that they didn't do,

23     does anyone think there is nothing

24     someone could present that would make you

25     say you did something that you didn't do?

```
 1                  Mr. Sterwerf, how are you?

 2                  PROSPECTIVE JUROR STERWERF:  I am

 3         good.

 4                  MR. JACKSON:  I have way more

 5         speeding tickets than you do.  I will

 6         tell you I deserve every one.  I always

 7         wanted them not to give me one.  It is an

 8         unfortunate consequence of traveling a

 9         lot.

10                  In those situations, did you ever

11         take any of your traffic tickets to

12         trial?  Did you ever go to court?

13                  PROSPECTIVE JUROR STERWERF:  No.

14                  MR. JACKSON:  Did you ever have any

15         bad experience from a police officer?

16                  PROSPECTIVE JUROR STERWERF:  No.

17                  MR. JACKSON:  By bad experience,

18         they talked to you meanly, felt that you

19         didn't do something you were supposed to?

20                  PROSPECTIVE JUROR STERWERF:  No.

21                  MR. JACKSON:  In your

22         questionnaire, you mentioned operations

23         management.  Could you explain that to

24         me?

25                  PROSPECTIVE JUROR STERWERF:  Say,
```

1    like, in manufacturing, purchasing,

2    scheduling, even being, like, the head of

3    a small company.

4        MR. JACKSON:  When you said that, I

5    was thinking of the logistics commercial.

6    Is that what you deal with?

7        MR. JACKSON:  Some of that.  Deal

8    with some logistics.

9        MR. JACKSON:  Okay.  So do you, in

10    your field, do you have to get a product

11    from point A to point B?

12        PROSPECTIVE JUROR STERWERF:  Yes.

13        MR. JACKSON:  Sometimes has to go

14    through many different handlers to get it

15    there?

16        PROSPECTIVE JUROR STERWERF:  Sure.

17        MR. JACKSON:  If somebody messes up

18    something, that may make the package not

19    get there.

20        PROSPECTIVE JUROR STERWERF:  It is

21    a possibility, yes.

22        MR. JACKSON:  Trying to make sure I

23    understand what it is.  That's okay.

24    Have you or a close family member ever

25    been involved in any type of legal

1   process?

2           PROSPECTIVE JUROR STERWERF:  No.

3           MR. JACKSON:  Never a victim of a

4   crime?

5           PROSPECTIVE JUROR STERWERF:  I did

6   think of something while we were up here.

7   We did have a carpet cleaner one point in

8   time go through my wife's jewelry box.

9   Filed it with police and insurance.

10          MR. JACKSON:  Did police follow up

11  with you?

12          PROSPECTIVE JUROR STERWERF:  Not

13  really.  They could never find the

14  gentleman that took the jewelry.

15          MR. JACKSON:  Assuming you never

16  went to court.

17          PROSPECTIVE JUROR STERWERF:  No.

18          MR. JACKSON:  Did that change your

19  idea what kind of reporting a crime and

20  what crime investigation should look like

21  or were your expectations met?

22          PROSPECTIVE JUROR STERWERF:  Of

23  course, our expectations were met.  If

24  you can't find the individual who did the

25  crime, there is not a whole lot you can

```
1    do.
2              MR. JACKSON:  Did you feel the
3    police did what they could do to find
4    that person?
5              PROSPECTIVE JUROR STERWERF:  As far
6    as I know, yes.
7              MR. JACKSON:  Let me ask you
8    something.  Obviously, we talked about
9    being here, we are now cogs in the
10   justice system.  What would you think if
11   Mr. Glenn didn't take the stand?
12             PROSPECTIVE JUROR STERWERF:  That's
13   his choice.
14             MR. JACKSON:  Would you think he
15   had something to hide?
16             PROSPECTIVE JUROR STERWERF:  No.
17             MR. JACKSON:  Would you judge him
18   differently versus him taking the stand
19   or not taking the stand?
20             PROSPECTIVE JUROR STERWERF:  No.
21             MR. THARP:  Mr. Williams, how are
22   you?
23             PROSPECTIVE JUROR WILLIAMS:  Well.
24   How are you?
25             MR. JACKSON:  Doing well.  You have
```

1    a child at Xavier?

2         PROSPECTIVE JUROR WILLIAMS:  I do.

3         MR. JACKSON:  College.

4         PROSPECTIVE JUROR WILLIAMS:

5    Correct.

6         MR. JACKSON:  Probably best we get

7    this out in the open now.  I went to the

8    University of Cincinnati undergrad and

9    law school.  You will not hold it against

10   me?

11        PROSPECTIVE JUROR WILLIAMS:  I have

12   Bearcats in my family, too.

13        MR. JACKSON:  You mention on your

14   statement that police officers have a

15   duty to serve and protect.

16        PROSPECTIVE JUROR WILLIAMS:

17   Correct.

18        MR. JACKSON:  It seems -- I don't

19   want to put words in your mouth -- you

20   have a fairly favorable view of police

21   officers; is that fair to say?

22        PROSPECTIVE JUROR WILLIAMS:  In

23   general, yes.

24        MR. JACKSON:  Do you think that

25   police officers might, in instances, be

```
 1        mistaken?
 2               PROSPECTIVE JUROR WILLIAMS:
 3               Absolutely.
 4               MR. JACKSON:  What if a police
 5        officer sat in the witness chair and
 6        testified and they told you something and
 7        it didn't make sense to you.  Would you
 8        give the police officer the benefit of
 9        the doubt because they are an officer?
10               PROSPECTIVE JUROR WILLIAMS:  No.
11               MR. JACKSON:  Why not?
12               PROSPECTIVE JUROR WILLIAMS:  I am
13        not going to treat them different just
14        because they are a police officer.  And
15        it would have to be based on facts.
16               MR. JACKSON:  Have you, in your
17        experience, known police officers to be
18        wrong, not intentionally, but mistaken?
19               PROSPECTIVE JUROR WILLIAMS:
20               Personally?
21               MR. JACKSON:  Yes.
22               PROSPECTIVE JUROR WILLIAMS:  No.
23               MR. JACKSON:  You think it could
24        happen?
25               PROSPECTIVE JUROR WILLIAMS:  Sure.
```

```
1          MR. JACKSON:  We are all human
2     beings.
3          PROSPECTIVE JUROR WILLIAMS:  Right.
4          MR. JACKSON:  I have to ask you
5     about your situation.  Was that Hamilton
6     County?
7          PROSPECTIVE JUROR WILLIAMS:  The
8     OVI, yes.
9          MR. JACKSON:  Does that make you --
10    you don't need to tell me what happened.
11    I am not concerned about what happened
12    and the result.  I am concerned about the
13    process.  Do you feel the process was
14    fair to you?
15         PROSPECTIVE JUROR WILLIAMS:  The
16    entire process from beginning to end?
17         MR. JACKSON:  Yes.
18         PROSPECTIVE JUROR WILLIAMS:  For
19    the most part.
20         MR. JACKSON:  Sounds like there is
21    something you might have felt was not as
22    fair as should be.
23         PROSPECTIVE JUROR WILLIAMS:  I
24    believe there were instances and language
25    used at different times from the
```

1    beginning to the end that could have been

2    presented in a different way to give a

3    better understanding of what was actually

4    being said.

5         MR. JACKSON:  If that was done, in

6    your opinion, would that have made the

7    process more fair?

8         PROSPECTIVE JUROR WILLIAMS:

9         Perhaps.

10        MR. JACKSON:  Who would you have

11   attributed that to, the officer or other

12   parties; prosecutor?

13        PROSPECTIVE JUROR WILLIAMS:  The

14   arresting officer.

15        MR. JACKSON:  Anything about that

16   experience that makes you feel like you

17   don't want to be involved on the jury

18   side of this case?

19        PROSPECTIVE JUROR WILLIAMS:  No.

20        MR. JACKSON:  Thank you, sir.

21   Ms. Felss, how are you?

22        PROSPECTIVE JUROR FELSS:  Good.

23   How about you?

24        MR. JACKSON:  Doing well.

25        Mr. Tharp said I don't know another

1       way to go through this.  Apologize.

2       Everybody knows it is coming.  You used

3       to work at Ethicon here in Hamilton

4       County?

5               PROSPECTIVE JUROR FELSS:  Yes.

6               MR. JACKSON:  Out in Blue Ash?

7               PROSPECTIVE JUROR FELSS:  Blue Ash.

8               MR. JACKSON:  Used to pass there.

9       What did you do for Ethicon?

10              PROSPECTIVE JUROR FELSS:  I had

11      several roles, all of which were

12      department coordinators.

13              MR. JACKSON:  Did you deal with

14      science or management?

15              PROSPECTIVE JUROR FELSS:  More

16      management.

17              MR. JACKSON:  Dealt with people?

18              PROSPECTIVE JUROR FELSS:  Yes.

19              MR. JACKSON:  Did you ever have to

20      make a determination of maybe two

21      different stories?

22              PROSPECTIVE JUROR FELSS:  I was not

23      a supervisor.  I was a coordinator.

24              PROSPECTIVE JUROR FELSS:  Somebody

25      else had to deal with that stuff?

```
1              PROSPECTIVE JUROR FELSS:  Yes.
2              MR. JACKSON:  I don't envy those
3         people.  You realize that's what we will
4         ask you to do here.  Obviously, we
5         wouldn't be here if our story wasn't
6         different than the prosecutor's.  You are
7         going to have to make some decisions.
8         Are okay with that?
9              PROSPECTIVE JUROR FELSS:  Sure.
10             MR. JACKSON:  What do you think you
11        would need to make a decision in this
12        case?
13             PROSPECTIVE JUROR FELSS:
14             Information.
15             MR. JACKSON:  From?
16             PROSPECTIVE JUROR FELSS:  From
17        those witnesses.
18             MR. JACKSON:  You heard what I said
19        about the proof beyond a reasonable
20        doubt?
21             PROSPECTIVE JUROR FELSS:  Correct.
22             MR. JACKSON:  Are you able to say
23        there is some evidence presented but it
24        has not given me that feeling that I have
25        proof beyond a reasonable doubt.
```

```
1              PROSPECTIVE JUROR FELSS:  Yes.

2              MR. JACKSON:  If that happens, will

3         you find Mr. Glenn not guilty?

4              PROSPECTIVE JUROR FELSS:  Yes.

5              MR. JACKSON:  Thank you, ma'am.

6              Ms. Ramahi, did you ever teach

7         Spanish?

8              PROSPECTIVE JUROR RAMAHI:  I

9         didn't.  My kids.

10             MR. JACKSON:  How are they?  Do

11        they speak?

12             PROSPECTIVE JUROR RAMAHI:  They

13        know colors, words.

14             MR. JACKSON:  I know that, too.

15        Took it through high school, years of

16        college, still struggling.

17             On your questionnaire, I was trying

18        to listen when Mr. Tharp asked you.  You

19        put you don't have members of your family

20        who are police officers -- strike that.

21        You are not related to any police

22        officers or prosecutors.  You said, "They

23        are here to keep you safe."

24             PROSPECTIVE JUROR RAMAHI:  Correct.

25             MR. JACKSON:  Does that give them
```

1    extra credibility if they were to take

2    the stand?

3         PROSPECTIVE JUROR RAMAHI:  I don't

4    think so.

5         MR. JACKSON:  You also mention Mr.

6    Tharp did ask you about answers, if you

7    were being truthful.

8         PROSPECTIVE JUROR RAMAHI:  Yes.

9         MR. JACKSON:  Have you watched a

10    jury show on television?

11         PROSPECTIVE JUROR RAMAHI:  I love

12    Law & Order.

13         MR. JACKSON:  I don't know about

14    Mr. Tharp.  I guess he did, but you grew

15    up on Law & Order.  Only bad thing is

16    everybody got found not guilty on Law &

17    Order.  That's not the truth.  I found

18    maybe two people were found not guilty on

19    Law & Order.  Law & Order -- obviously, I

20    love the show.  You watch the regular --

21         PROSPECTIVE JUROR RAMAHI:  I love

22    them all.

23         MR. JACKSON:  I don't know all of

24    them.  I know SVU.  Regular Law & Order.

25    They usually don't show jurors

1      deliberating.  What you will be called to
2      do I would say 99 times out of 100, there
3      is no issue.  Are you able to sit back
4      and listen to your fellow jurors, offer
5      your opinions?  Is that going to be
6      something that bothers you?
7              PROSPECTIVE JUROR RAMAHI:  I can
8      certainly do that.
9              MR. JACKSON:  You would like to
10     serve, if called to serve?
11             PROSPECTIVE JUROR RAMAHI:  It is my
12     duty, yes.
13             MR. JACKSON:  Thank you.
14             Ms. Harlow, how are you?
15             PROSPECTIVE JUROR HARLOW:  Good.
16             MR. JACKSON:  No one has accused me
17     of talking softly.  I have a loud voice.
18     Only thing I may do is compensate, try to
19     keep it down, but I would always get in
20     trouble.  My voice is loud.  It carries
21     the most.  With that said, are you able
22     to hear me okay this afternoon?
23             PROSPECTIVE JUROR HARLOW:  Yes.
24             MR. JACKSON:  You put you are a
25     retired postal service --

1    PROSPECTIVE JUROR HARLOW:  I was.

2    MR. JACKSON:  Did you serve in the

3    military also?

4    PROSPECTIVE JUROR HARLOW:  No, I

5    did not.

6    MR. JACKSON:  Where was most of

7    your postal service?  Was that in

8    Cincinnati?

9    PROSPECTIVE JUROR HARLOW:  Yes.

10   MR. JACKSON:  Mr. Tharp pointed out

11   this idea of an indictment.  I think he

12   stated, well, the formal charging

13   instrument, basically, says Mr. Glenn is

14   charged with trafficking and possession

15   of drugs.

16   You understand that?

17   PROSPECTIVE JUROR HARLOW:  Yes.

18   MR. JACKSON:  Do you understand by

19   virtue of him being charged, it does not

20   mean he has been convicted of anything?

21   PROSPECTIVE JUROR HARLOW:  I

22   understand that.

23   MR. JACKSON:  Do you understand if

24   the judge asks you now, Ms. Harlow, is

25   Mr. Glenn guilty or innocent, that you

1    would have to say he is innocent?

2         PROSPECTIVE JUROR HARLOW:  Until

3    proven guilty.

4         MR. JACKSON:  That is correct.

5    Thank you, Ms. Harlow.

6         Ms. Richter, how are you?

7         PROSPECTIVE JUROR RICHTER:  Fine.

8    How are you?

9         MR. JACKSON:  I am good.

10        PROSPECTIVE JUROR RICHTER:  I am a

11   Bearcat.

12        MR. JACKSON:  You don't have to be

13   with me.  I would rather you not be

14   against me.

15        You are a teacher?

16        PROSPECTIVE JUROR RICHTER:  Yes.

17        MR. JACKSON:  What subjects do you

18   teach?

19        MR. JACKSON:  Fifth grade, language

20   arts, reading, writing and social

21   studies.

22        MR. JACKSON:  How long have you

23   been a teacher?

24        PROSPECTIVE JUROR RICHTER:

25        Twenty-two years.

1           MR. JACKSON:  You mentioned there

2     is a civil suit involving your brother or

3     brother-in-law.

4           PROSPECTIVE JUROR RICHTER:  My

5     brother in law sued my husband.

6           MR. JACKSON:  Is that pending here

7     in Hamilton County?

8           PROSPECTIVE JUROR RICHTER:  No,

9     Butler County.

10          MR. JACKSON:  I was listening to

11    your answers, reading body language.

12    Have you ever been involved in a case in

13    Hamilton County?

14          PROSPECTIVE JUROR RICHTER:  No,

15    never.

16          MR. JACKSON:  I don't want to put

17    words in anybody else's mouth.  Do you

18    feel this person, your husband's brother

19    is getting special treatment because he

20    is a police officer?

21          PROSPECTIVE JUROR RICHTER:  Not

22    now, but at a point, yes.

23          MR. JACKSON:  Does that color your

24    view of police officers, in general?

25          PROSPECTIVE JUROR RICHTER:  My view

1    of them outside the work environment,

2    maybe taking advantage of the position

3    possibly, but not necessarily work.

4        MR. JACKSON:  This is ancillary

5    benefits they get but not in relation to

6    what they do?

7        PROSPECTIVE JUROR RICHTER:  Correct.

8        MR. JACKSON:  Mr. Tharp said, as I

9    imagine the majority of the case is about

10   police officers and testifying, do you

11   think your issues with this officer will

12   make you somehow be biased against

13   officers that testify in this trial?

14       PROSPECTIVE JUROR RICHTER:  I don't

15   think so.  I have done a lot of thinking

16   and I don't think so.

17       MR. JACKSON:  Did you hear what I

18   asked of Ms. Harlow about the -- let me

19   back up.

20       Has anyone served on Grand Jury

21   before?  You understand the fact that he

22   is indicted does not mean anything has

23   been proven against him?

24       PROSPECTIVE JUROR RICHTER:  Yes.

25       MR. JACKSON:  Would you be fair

1          judging the evidence both for the State

2          and for Mr. Glenn?

3                    PROSPECTIVE JUROR RICHTER:  Yes.

4                    MR. JACKSON:  Mr. Standiford,

5          hello, again.  You mention you have a BA

6          from UK.  What was your field of study?

7                    PROSPECTIVE JUROR STANDIFORD:

8                    Psychology.

9                    MR. JACKSON:  Does that make you

10         think -- every once in a while I watch

11         Bill O'Reilly.  Every once in a while

12         Bill O'Reilly has a body language expert

13         who is going to be a psychologist.  Does

14         your field of study -- does that cause

15         you to believe you would be able to tell

16         whether somebody is lying or telling the

17         truth or not?

18                   PROSPECTIVE JUROR STANDIFORD:  No.

19                   MR. JACKSON:  Would that color in

20         any way your perception of evidence if a

21         witness takes the stand?

22                   PROSPECTIVE JUROR STANDIFORD:  No.

23                   MR. JACKSON:  Never served as a

24         juror?

25                   PROSPECTIVE JUROR STANDIFORD:  No,

1    I haven't.

2         MR. JACKSON:  Have you ever been

3    involved in the court system with a loved

4    one arrested, a friend?

5         PROSPECTIVE JUROR STANDIFORD:  No,

6    I haven't.

7         MR. JACKSON:  Would you like to

8    serve on this jury?

9         PROSPECTIVE JUROR STANDIFORD:  Yes.

10        MR. JACKSON:  Thank you.

11        Hello, Ms. Wilcox.  I think I asked

12   you, but if not, I get another chance.

13   You said you only testified four times.

14        PROSPECTIVE JUROR WILCOX:  Four or

15   five times.

16        MR. JACKSON:  Do you work with

17   police officers a lot?

18        PROSPECTIVE JUROR WILCOX:  No.

19        MR. JACKSON:  Do you work with them

20   at all?

21        PROSPECTIVE JUROR WILCOX:  No.

22        MR. JACKSON:  You deal with -- you

23   said you never testified in Juvenile

24   Court?

25        PROSPECTIVE JUROR WILCOX:  Correct.

```
1              MR. JACKSON:  Do you deal with
2      mostly adults, not children?
3              PROSPECTIVE JUROR WILCOX:  Correct.
4              MR. JACKSON:  Have you testified at
5      a criminal trial?
6              PROSPECTIVE JUROR WILCOX:  Yes.
7              MR. JACKSON:  Have you had a bad
8      experience with a criminal defense
9      attorney?
10             PROSPECTIVE JUROR WILCOX:  No.
11             MR. JACKSON:  We are nice people.
12     Have you had any bad experiences in the
13     court system at all?
14             PROSPECTIVE JUROR WILCOX:  No.
15             MR. JACKSON:  Nothing about having
16     to testify makes you hesitant to serve as
17     a juror?
18             PROSPECTIVE JUROR WILCOX:  No.
19             MR. JACKSON:  Mr. Tharp asked you
20     before, you mentioned -- I was trying to
21     get it down.  There was some exchange
22     about whether you felt comfortable.  Do
23     you feel you have a duty to serve as a
24     juror?
25             PROSPECTIVE JUROR WILCOX:  Yes.
```

109

1             MR. JACKSON:  Would you like to

2     serve here?

3             PROSPECTIVE JUROR WILCOX:  Yes.

4             MR. JACKSON:  Do you think you

5     could be fair to Mr. Tharp and myself and

6     my client?

7             PROSPECTIVE JUROR WILCOX:  Yes.

8             MR. JACKSON:  Ms. Johnson, how are

9     you?

10           PROSPECTIVE JUROR JOHNSON:  Fine.

11           MR. JACKSON:  Not going to hold it

12    against you.  You go to Xavier?

13           PROSPECTIVE JUROR JOHNSON:  Yes.  I

14    am going to be transferring.

15           MR. JACKSON:  Excellent.  What is

16    your field of study?

17           PROSPECTIVE JUROR JOHNSON:

18        Criminal justice.

19           MR. JACKSON:  One of your answers

20    said you had a teacher who was an

21    ex-police officer.  How far have you gone

22    in criminal justice studies?

23           PROSPECTIVE JUROR JOHNSON:  I am

24    about to be going into my junior year.

25           MR. JACKSON:  Two years so far?

1        PROSPECTIVE JUROR JOHNSON:  Yes.

2        MR. JACKSON:  How does that

3   educational background affect how you

4   view this whole process?

5        PROSPECTIVE JUROR JOHNSON:  I

6   pretty much have been learning.  Nice to

7   see the action.  But I wouldn't say it

8   would affect my decision.  I kind of know

9   a little bit more what's going on.

10        MR. JACKSON:  Does it surprise you

11   at all, this process, what you have seen

12   so far?

13        PROSPECTIVE JUROR JOHNSON:  Yes.

14        MR. JACKSON:  Do you have

15   aspirations, goals, to be a police

16   officer?

17        PROSPECTIVE JUROR JOHNSON:  No.

18        MR. JACKSON:  What is your intent

19   with your criminal justice degree?

20        PROSPECTIVE JUROR JOHNSON:  To be

21   an attorney.

22        MR. JACKSON:  Excellent.

23        PROSPECTIVE JUROR JOHNSON:  I am

24   thinking about being an attorney.

25        MR. JACKSON:  Okay.  Does that --

```
 1        will that affect you in any way?
 2              PROSPECTIVE JUROR JOHNSON:  No.
 3        Because it is something that's in my mind
 4        I want to do in the field of criminal
 5        justice.  Not sure what I will do with
 6        it.  I am weighing my options and reading
 7        about things I could do in the field.
 8        There is a certain thing I want to do.
 9              MR. JACKSON:  Have you ever
10        observed a courtroom before?
11              PROSPECTIVE JUROR JOHNSON:  Yes.
12              MR. JACKSON:  Where have you
13        observed?  Here?
14              PROSPECTIVE JUROR JOHNSON:  Yes.
15              MR. JACKSON:  This courtroom?
16              PROSPECTIVE JUROR JOHNSON:  Not
17        this one.
18              MR. JACKSON:  Do you remember the
19        judge?
20              PROSPECTIVE JUROR JOHNSON:  Dwayne
21        Mallory.
22              MR. JACKSON:  Did you go to Bill
23        Mallory?
24              PROSPECTIVE JUROR JOHNSON:  No.
25              MR. JACKSON:  I know Dwayne.  Bill
```

1    Mallory is more animated than other

2    judges.  Dwayne Mallory is pretty

3    animated, too.  Did that change your idea

4    what court is like, what it is like to be

5    a person charged with a crime, go in

6    front of a judge?  How was that

7    experience?

8         PROSPECTIVE JUROR JOHNSON:  It is

9    not like I was imagining.

10         MR. JACKSON:  Depending what shows

11   you watch.  You think you could be fair

12   to both sides of this case?

13         PROSPECTIVE JUROR JOHNSON:  Yes.

14         MR. JACKSON:  Thank you,

15   Ms. Johnson.

16         All right.  Ms. Griffith, you have

17   not spoken at all.  Where did you go to

18   school?

19         PROSPECTIVE JUROR GRIFFITH:  U.C.

20         MR. JACKSON:  You studied computer

21   programming?

22         PROSPECTIVE JUROR GRIFFITH:  Yes.

23         MR. JACKSON:  Now, Mr. Tharp asked

24   about what I can only describe as the CSI

25   effect.  I think you mentioned you

1    watched it.

2         PROSPECTIVE JUROR GRIFFITH:  I only

3    watched it a couple times.

4         MR. JACKSON:  I will try to

5    summarize what he said.  Essentially, he

6    made statements, cases don't always come

7    together like CSI, is the bottom line.  I

8    think that's true.  Would you agree there

9    has to be some evidence that the person

10   charged with a crime did a crime before

11   you were willing to convict?

12        PROSPECTIVE JUROR GRIFFITH:  Yes.

13        MR. JACKSON:  Do you know that

14   there are such things as fingerprints?

15        PROSPECTIVE JUROR GRIFFITH:  Yes.

16        MR. JACKSON:  DNA evidence?

17        PROSPECTIVE JUROR GRIFFITH:  Yes.

18        MR. JACKSON:  Those things are not

19   made up from the show.  Those things

20   exist and there are people who can test

21   for them, serve them out, that kind of

22   thing?

23        PROSPECTIVE JUROR GRIFFITH:  Yes.

24        MR. JACKSON:  You said you were

25   called but never sat on a jury?

1     PROSPECTIVE JUROR GRIFFITH:  That's

2   correct.  I have been called about six

3   times but never made it this far.

4     MR. JACKSON:  This is the first

5   time in the box?

6     PROSPECTIVE JUROR GRIFFITH:  We

7   filed in and they settled before anything

8   happened.

9     MR. JACKSON:  That happens.  Does

10   that process, having been around, make

11   you not want to serve today or in this

12   case?

13     PROSPECTIVE JUROR GRIFFITH:  No.

14     MR. JACKSON:  Had any negative

15   effect on you?

16     PROSPECTIVE JUROR GRIFFITH:  No.

17     MR. JACKSON:  Thank you.

18   Mr. Flukman, I don't know what a civil

19   engineer does.  Explain that to me.

20     PROSPECTIVE JUROR FLUKMAN:  In

21   mine, I focused in on transportation.  I

22   am a planning engineer for southwest

23   Ohio.  I deal with interstates and

24   roadways.

25     MR. JACKSON:  Your fault there is

1      all the construction on 75?

2          PROSPECTIVE JUROR FLUKMAN:  Great

3      construction.  Economic development.

4          MR. JACKSON:  You mentioned you had

5      your car broken into.

6          PROSPECTIVE JUROR FLUKMAN:  Yes.

7          MR. JACKSON:  Did police come out

8      to investigate?

9          PROSPECTIVE JUROR FLUKMAN:  They

10     came out.  Called them.  It took a while.

11     They finally came out.

12         MR. JACKSON:  How did you feel

13     about that experience?

14         PROSPECTIVE JUROR FLUKMAN:  It was

15     violating because they got hold of my

16     wife's purse.  We found it strewn over

17     about a mile of roadway.

18         MR. JACKSON:  Did the police, did

19     they dust for fingerprints, look for

20     evidence?

21         PROSPECTIVE JUROR FLUKMAN:  They

22     dusted windows and doors for

23     fingerprints.

24         MR. JACKSON:  Able to find anyone?

25         PROSPECTIVE JUROR FLUKMAN:  No.

1      MR. JACKSON:  Did that give you a

2  bad feeling about police?

3      PROSPECTIVE JUROR FLUKMAN:  No.

4      MR. JACKSON:  Was that here in

5  Hamilton County?

6      PROSPECTIVE JUROR FLUKMAN:  Yes.

7      MR. JACKSON:  You mentioned in

8  general comments about the proof beyond a

9  reasonable doubt.  How do you feel about

10  that?

11      PROSPECTIVE JUROR FLUKMAN:  If it

12  is evidence, it is proof of evidence

13  what's going on.

14      MR. JACKSON:  Do you understand the

15  comparison between dependency court,

16  which is clear, convincing evidence, and

17  this court, which is proof beyond a

18  reasonable doubt?

19      PROSPECTIVE JUROR FLUKMAN:  That's

20  what you described.

21      MR. JACKSON:  Do you have -- do you

22  take any issue with my characterization

23  of that?  Do you think that's an accurate

24  statement?

25      PROSPECTIVE JUROR FLUKMAN:  I have

1  never been to dependency court.  Hard to

2  see that bar is -- how far apart it is.

3        MR. JACKSON:  Do you think you will

4  judge any person who takes the stand,

5  whether police officer or civilian, by

6  the same standard?

7        PROSPECTIVE JUROR FLUKMAN:  I don't

8  understand the question.

9        MR. JACKSON:  That was a bad

10  question.  If a police officer were to

11  take the stand and you hear them testify,

12  what are some of the things you use to

13  judge whether they were telling the truth

14  or not?

15        PROSPECTIVE JUROR FLUKMAN:  I have

16  to listen, see what the evidence is.

17        MR. JACKSON:  If things they

18  testify to didn't jive with what you know

19  or other evidence, would you think that

20  officer may be mistaken?

21        PROSPECTIVE JUROR FLUKMAN:  It

22  could.  If not logical, there is a

23  question.

24        MR. JACKSON:  Mr. White, how are

25  you, sir?

1     PROSPECTIVE JUROR WHITE:  Good.

2         MR. JACKSON:  We have spoken

3     before.  I wanted to ask about some of

4     your answers to Mr. Tharp's questions.

5     Do you think it is important to serve on

6     a jury?

7         PROSPECTIVE JUROR WHITE:  Just

8     being here, I feel more important but

9     before I came, I didn't think it

10    mattered.  Being here and experiencing

11    the whole thing, I feel it is more

12    important because I think I might have

13    views other people might not, influence

14    judgment one way or another.

15        MR. JACKSON:  Mr. Tharp read names

16    of officers and potential witnesses.  You

17    have never, to your recollection, dealt

18    with those individuals?

19        PROSPECTIVE JUROR WHITE:  No.

20        MR. JACKSON:  Do you think you

21    could be fair and listen to what they had

22    to say?

23        PROSPECTIVE JUROR WHITE:  Yeah, I

24    mean, just because somebody is a police

25    officer doesn't mean I hate them or

1     anything like that.  But, like I said,

2     any profession, you will have people that

3     do things to an extreme and not as much

4     to an extreme, they follow rules to a "T"

5     so I wouldn't have a problem with

6     specific people, if they didn't do

7     anything towards me.

8          MR. JACKSON:  Is it fair to say you

9     would be fair to any officer until they

10     showed you something otherwise?  Is that

11     accurate?

12          PROSPECTIVE JUROR WHITE:  That's

13     accurate.

14          MR. JACKSON:  Judge, pass for

15     cause.

16          THE COURT:  Thank you, Mr. Jackson.

17          Mr. Tharp, did you want to do

18     anything in regards to your previous

19     motion to the court?

20          MR. THARP:  We withdraw our motion

21     for cause.

22          THE COURT:  Thank you very much.  I

23     appreciate that.  Everybody okay?  If you

24     need to do anything -- I got four kids

25     and four grandkids, too.  You need to go

1          to the bathroom, let me know.  Not a

2          problem.  That's part of the game.

3              Mr. Tharp, you are up as far as

4          challenges.  Any challenges?

5              MR. THARP:  We would like to thank

6          and excuse Juror 6, Teresa Richter.

7              THE COURT:  You are excused.

8              (Prospective Juror Richter was

9          excused and Prospective Juror Breiden

10         was seated.)

11             THE COURT:  Deborah Breiden, step

12         up.  Take that seat in the corner.  I

13         would appreciate it.

14             Good afternoon.  It is Deborah

15         Brieden?

16             PROSPECTIVE JUROR BRIEDEN:  Yes.

17             THE COURT:  Were you able to hear

18         the questions?

19             PROSPECTIVE JUROR BRIEDEN:  I did.

20             THE COURT:  Do you have any

21         questions, problems or concerns with

22         anything asked?

23             PROSPECTIVE JUROR BRIEDEN:  No.

24             THE COURT:  Do you know of any

25         reason why you could not sit on this jury

1　　　　and be anything but a fair and impartial

2　　　　juror?

3　　　　　　　　PROSPECTIVE JUROR BRIEDEN:　No.

4　　　　　　　　THE COURT:　Appreciate it.

5　　　　　　　　Mr. Tharp.

6　　　　　　　　MR. THARP:　Good afternoon.　How

7　　　　are you?

8　　　　　　　　PROSPECTIVE JUROR BRIEDEN:　Good.

9　　　　　　　　MR. THARP:　Were you able to hear

10　　　all the many questions I asked the

11　　　prospective panel as well as defense?

12　　　　　　　　PROSPECTIVE JUROR BRIEDEN:　I did.

13　　　　　　　　MR. THARP:　Anything came to mind

14　　　you might need to add or popped into your

15　　　head?

16　　　　　　　　PROSPECTIVE JUROR BRIEDEN:　No.

17　　　　　　　　MR. THARP:　Did you hear defense's

18　　　explanation about clear and convincing

19　　　evidence versus reasonable doubt?

20　　　　　　　　PROSPECTIVE JUROR BRIEDEN:　I did

21　　　because I actually do deal with orphanage

22　　　PCC so I am at the lower level with drug

23　　　court.

24　　　　　　　　MR. JACKSON:　You are involved in

25　　　Children's Home?

1      PROSPECTIVE JUROR BRIEDEN:  Correct.

2           MR. THARP:  That's what you are

3      talking about?

4           PROSPECTIVE JUROR BRIEDEN:  Yes.

5           MR. THARP:  Dependency is covered

6      by Common Pleas Court in Ohio.

7           PROSPECTIVE JUROR BRIEDEN:  I am in

8      Kentucky.

9           MR. THARP:  Circuit Court over

10     there.

11          PROSPECTIVE JUROR BRIEDEN:  I live

12     in Hamilton County.

13          MR. THARP:  Everything is named

14     differently in every state.  Here in

15     Hamilton County, that dependency is not a

16     criminal matter.  That's why it is a

17     different level.  Here at criminal trial,

18     it is reasonable doubt.  A civil matter

19     is clear and convincing versus reasonable

20     doubt.  That's the reason.  Because of

21     those very important situations, it is a

22     much different thing.  Understand?

23          PROSPECTIVE JUROR BRIEDEN:  Yes.

24          MR. THARP:  Great.  You have never

25     been called as a juror before?

1    PROSPECTIVE JUROR BRIEDEN:  I have

2    not.

3    MR. THARP:  Some of the same

4    questions.  You have never been involved

5    in the judicial system?

6    PROSPECTIVE JUROR BRIEDEN:  My son

7    had a speeding ticket at 28.  I think it

8    was 16.  Went too fast.  I had to file

9    small claims against somebody, won a

10    judgment.  He hasn't paid.

11    My husband and I, we have rentals

12    so we have had to evict one of our

13    tenants one time.  That was in Butler

14    County.

15    MR. THARP:  Besides the speeding

16    tickets, those are different standards,

17    different situations.

18    PROSPECTIVE JUROR BRIEDEN:  Yes.

19    MR. THARP:  Able to separate those?

20    PROSPECTIVE JUROR BRIEDEN:  Yes.

21    MR. THARP:  Do you think it will or

22    will not create bias?

23    PROSPECTIVE JUROR BRIEDEN:  Will

24    not.

25    MR. THARP:  You believe you could

1       be a fair person based on your position

2       in court management?  You deal with

3       people?

4           PROSPECTIVE JUROR BRIEDEN:  Yes.

5           MR. THARP:  Dealing with people,

6       you have to use common sense, whether

7       they are telling the truth, doing a good

8       job, correct?

9           PROSPECTIVE JUROR BRIEDEN:  Correct.

10          MR. THARP:  You will use those

11      skills here plus what the Judge says?

12          PROSPECTIVE JUROR BRIEDEN:  Yes.

13          MR. THARP:  If you stay on this

14      jury, what will you make your decision

15      based on?

16          PROSPECTIVE JUROR BRIEDEN:  Based

17      on the testimony presented.

18          MR. THARP:  Fair and impartial with

19      the State?

20          PROSPECTIVE JUROR BRIEDEN:  Yes.

21          MR. THARP:  Shouldn't say most

22      importantly, but you are a member of the

23      Royal Order of Police?

24          PROSPECTIVE JUROR BRIEDEN:  Correct.

25          MR. THARP:  What is that?

1          PROSPECTIVE JUROR BRIEDEN:  They

2     support orphanages.  It is a men's

3     organization but women have their

4     chapter, too.  That's what we support

5     lodges across America.  Kids who become

6     wards of the state can apply to go there

7     and, basically, raise them.  In today's

8     terminology, we don't use orphanages.

9     Then you work your way up in degrees,

10    depending how far you want to do it.

11    That supports children.

12          MR. THARP:  Always heard of that.

13    How long have you been doing that?

14          PROSPECTIVE JUROR BRIEDEN:

15          Seventeen years.

16          MR. THARP:  Great.  Thank you very

17    much.  I appreciate it.

18          Pass for cause.

19          THE COURT:  Thank you, Mr. Tharp.

20          Mr. Jackson.

21          MR. JACKSON:  Good afternoon,

22    Ms. Brieden.  I was trying to listen.

23    Did you say you do work in drug court?

24          PROSPECTIVE JUROR BRIEDEN:  I

25    don't. I work in-home.  We have

1       adolescent children, from 7 to 17, some

2       whom live with us at PCC.  It started in

3       the early 1900s.  We have a division

4       called our Champions Program.  We have

5       social workers that deal with children

6       that come from drug court that could be

7       offensive. We are trying to keep them out

8       of trouble.

9               MR. JACKSON:  You are not called

10      upon to testify in court?

11              PROSPECTIVE JUROR BRIEDEN:  No.

12              MR. JACKSON:  Do you work directly

13      with the children or children placed in

14      the home?

15              PROSPECTIVE JUROR BRIEDEN:  I have

16      some interactions with them.  I do their

17      billing.  Everybody is a mentor of the

18      staff.  I don't teach them.  I am not a

19      residential therapist.  I don't live in

20      the cottages with them.  No, I don't do

21      that.

22              MR. JACKSON:  You heard all the

23      stuff I asked the other members of the

24      jury.  Anything come to mind you

25      disagreed with or had input on?

1            PROSPECTIVE JUROR BRIEDEN:  No.

2            MR. JACKSON:  You had to go through

3    the process of evicting one tenant?

4            PROSPECTIVE JUROR BRIEDEN:  Correct.

5            MR. JACKSON:  Did you go to court?

6            PROSPECTIVE JUROR BRIEDEN:  I did.

7            MR. JACKSON:  Butler County?

8            PROSPECTIVE JUROR BRIEDEN:  Correct.

9            MR. JACKSON:  Was the process

10   different than you thought it would be?

11   Was it, you know, surprising?

12           PROSPECTIVE JUROR BRIEDEN:  It was.

13   We have never had to do it before.

14   Rewarding experience for my husband and

15   I.  The sad thing is, the home we

16   purchased was from an estate.  Person we

17   had to evict was his brother.  Basically,

18   we did good cop/bad cop.  I did bad cop.

19   It was his brother.  Didn't want

20   animosity.  I was the one -- I am on the

21   lease.  It was a learning curve we had to

22   do.  Everybody was friendly.  His brother

23   was friendly, understood the whole

24   process.  No negative experiences.

25           MR. JACKSON:  Have you had any

1      issues, negative or positive, with police

2      officers?

3              PROSPECTIVE JUROR BRIEDEN:  No.  I

4      know a lot.  My grandfather.  All

5      retired.  Within the group of friends, we

6      all came together.  Things like that.

7              MR. JACKSON:  Do you ever talk to

8      them about their work?

9              PROSPECTIVE JUROR BRIEDEN:  No.

10              MR. JACKSON:  You said they are

11      fire?

12              PROSPECTIVE JUROR BRIEDEN:  They

13      are fire, but interactions with police

14      have a piece of land and camp out.

15      Outside of work, everybody is off duty.

16              MR. JACKSON:  Anything about what

17      Mr. Tharp said, I said, made you not want

18      to serve this particular jury?

19              PROSPECTIVE JUROR BRIEDEN:  No.

20              MR. JACKSON:  Thank you, ma'am.

21              THE COURT:  Pass for cause?

22              MR. JACKSON:  Yes.

23              THE COURT:  Mr. Jackson, you are up

24      as far as challenges.

25              MR. JACKSON:  We would like to

1      thank and excuse Mr. Flukman.

2           THE COURT:  Thank you for your

3      services.  You are excused with our

4      thanks.  Watch your step as you step out.

5      You are off tomorrow and Friday.  Call

6      Friday to check when they may need you

7      again.

8           (Prospective Juror Flukman was

9      excused and Prospective Meshesha was

10     seated.)

11          THE COURT:  For the record, it is

12     Seblewongel, Meshesha.  Were you able to

13     hear the questions asked by the attorneys

14     as well as myself?

15         PROSPECTIVE JUROR SEBLEWONGEL:  Yes.

16         THE COURT:  Questions, problems

17     concerns with questions Mr. Tharp asked?

18         PROSPECTIVE JUROR SEBLEWONGEL:  No.

19         THE COURT:  Know of any reason you

20     could not sit on this jury and be

21     anything but fair an impartial juror?

22         PROSPECTIVE JUROR SEBLEWONGEL:  No.

23         THE COURT:  Thank you very much.

24     Mr. Tharp.

25         MR. THARP:  Thank you, Your Honor.

1      Good afternoon, ma'am.  You have lived in

2      Cincinnati.  Years prior, where did you

3      live?

4               PROSPECTIVE JUROR SIBLEWONGEL:

5      Ethiopia.

6               MR. THARP:  Fair to say English is

7      not your first language?

8               PROSPECTIVE JUROR SEBLEWONGEL:  No.

9               MR. THARP:  Fluent in English, no

10     problem?

11              PROSPECTIVE JUROR GRIFFITH:  No.

12              MR. THARP:  Ten years, I have to

13     ask.  You are an accountant?

14              PROSPECTIVE JUROR SEBLEWONGEL:  Yes.

15              MR. THARP:  What type of

16     accountant?

17              PROSPECTIVE JUROR SEBLEWONGEL:

18              Corporate.

19              MR. THARP:  I took accounting for a

20     bit.  Didn't work with me.

21              PROSPECTIVE JUROR SEBLEWONGEL:  Lot

22     of numbers.

23              MR. THARP:  Never been a part of

24     the judicial system?

25              PROSPECTIVE JUROR SEBLEWONGEL:  No.

```
1              MR. THARP:  Most importantly, do
2      you think you would be a good juror?  On
3      your questionnaire, you said, "Not sure."
4              PROSPECTIVE JUROR SEBLEWONGEL:  No.
5              MR. THARP:  How do you feel now?
6              PROSPECTIVE JUROR SEBLEWONGEL:  No.
7      I feel I would be a good juror.
8              MR. THARP:  Tell me why.
9              PROSPECTIVE JUROR SEBLEWONGEL:  As
10     long as you provide the right facts.  As
11     long as you provide the right evidence, I
12     definitely would be a good juror.
13             MR. THARP:  If the State is short
14     of evidence, what would you do?
15             PROSPECTIVE JUROR SEBLEWONGEL:  Not
16     sure.  Show me the facts.
17             MR. THARP:  If I don't prove
18     something, you cannot convict.
19             PROSPECTIVE JUROR SEBLEWONGEL:  I
20     cannot convict.
21             MR. THARP:  If the State does prove
22     something, if I don't prove anything, the
23     facts come out, but the State, if they
24     prove something, will you be able to
25     convict, be fair and impartial to both
```

```
1         parties?
2              PROSPECTIVE JUROR SEBLEWONGEL:  Yes.
3              MR. THARP:  Thank you.
4              Pass for cause.
5              THE COURT:  Thank you.
6              Mr. Jackson.
7              MR. JACKSON:  Good afternoon.  May
8    I ask you to speak up a bit?
9              PROSPECTIVE JUROR SEBLEWONGEL:
10             Sure.
11             MR. JACKSON:  I can hear you from
12   here.  I don't know if the court reporter
13   is struggling.  If you could make sure
14   she can hear you.  She has to take down
15   everything you say.
16             Was there anything I said you may
17   have taken some issue with?
18             PROSPECTIVE JUROR SEBLEWONGEL:  No.
19             MR. JACKSON:  Have you ever had a
20   friend or someone who has been involved
21   in the criminal justice system?
22             PROSPECTIVE JUROR SEBLEWONGEL:  I
23   have a friend who had a DUI.
24             MR. JACKSON:  How did that go?
25             PROSPECTIVE JUROR SEBLEWONGEL:  I
```

1    think his case was thrown out.

2         MR. JACKSON:  Here in Hamilton

3    County?

4         PROSPECTIVE JUROR SEBLEWONGEL:  No,

5    Dayton.

6         MR. JACKSON:  Did you go with that

7    friend to court?

8         PROSPECTIVE JUROR SEBLEWONGEL:  No.

9         MR. THARP:  You just knew that they

10   --

11        PROSPECTIVE JUROR SEBLEWONGEL:  Yes.

12        MR. JACKSON:  Was there anything

13   about their experience that made you have

14   some negative feelings towards police

15   officers?

16        PROSPECTIVE JUROR SEBLEWONGEL:  No.

17        MR. JACKSON:  Do you think you

18   could judge the credibility of a police

19   officer like everyone else?

20        PROSPECTIVE JUROR SEBLEWONGEL:  Yes.

21        MR. JACKSON:  Do you think they

22   deserve extra credibility points?

23        PROSPECTIVE JUROR SEBLEWONGEL:  No.

24        MR. JACKSON:  Is there anything

25   that would cause you to not want to serve

```
1        on this jury?
2               PROSPECTIVE JUROR SEBLEWONGEL:  No.
3               MR. JACKSON:  Thank you, ma'am.
4               Pass for cause.
5               THE COURT:  Thank you, Mr. Jackson.
6               Mr. Tharp, we are to you as far as
7        challenges.
8               MR. THARP:  At this time we would
9        like to thank and excuse Juror Number 12,
10       Melvin White.
11              THE COURT:  Thank you for your
12       service.  We appreciate you coming down.
13       Watch your step as you step out there.
14              (Prospective Juror White was
15       excused and Prospective Juror Salter
16       was seated.)
17              THE COURT:  Good afternoon.  Dante
18       Salter?
19              PROSPECTIVE JUROR SALTER:  Yes,
20       sir.
21              THE COURT:  Were you able to hear
22       the questions asked by the attorneys as
23       well as myself?
24              PROSPECTIVE JUROR SALTER:  Yes,
25       sir.
```

1          THE COURT:  Any questions, problems

2     or concerns with anything asked?

3          PROSPECTIVE JUROR SALTER:  No, sir.

4          THE COURT:  Know of any reason you

5     could not sit on this jury and be

6     anything but a fair and impartial juror?

7          PROSPECTIVE JUROR SALTER:  No, sir.

8          THE COURT:  Thank you very much.

9          Mr. Tharp.

10          MR. THARP:  Good afternoon.  How

11     are you doing today?

12          PROSPECTIVE JUROR SALTER:  Pretty

13     good.

14          MR. THARP:  Anything strike you,

15     anything go off in your mind, questions

16     you could hear?

17          PROSPECTIVE JUROR SALTER:  No.

18          MR. THARP:  You are a machinist?

19          PROSPECTIVE JUROR SALTER:  Yes.

20          MR. THARP:  Run a machine work tool

21     and die?

22          PROSPECTIVE JUROR SALTER:  I run --

23     a mill operator and grinder.

24          MR. THARP:  Years ago I worked in a

25     stamping factory.  I am feeling the pain.

1      Some days I remember well.  You never

2      served as a juror before?

3          PROSPECTIVE JUROR SALTER:  No.

4          MR. THARP:  Ever been called?

5          PROSPECTIVE JUROR SALTER:  This is

6      the first time.

7          MR. THARP:  When it said have you

8      or a member of your family been involved

9      in a crime, you wrote N/A.

10         PROSPECTIVE JUROR SALTER:  I wasn't

11     sure.  I mean family members have, but

12     not myself.

13         MR. THARP:  They were involved with

14     the police or judicial system?

15         PROSPECTIVE JUROR SALTER:  I was

16     involved in at least two myself.

17         MR. THARP:  Not to embarrass you.

18         PROSPECTIVE JUROR SALTER:  I was

19     out one night with friends and there was

20     an incident where me and a girl was

21     having words; me and my girlfriend.  She

22     started arguing with me outside the club.

23     Police officer there told me get in my

24     car and leave.  I got in my car to leave

25     and he got in his car, got behind me,

1    turned his lights on, so I stopped

2    immediately since I just got in the car,

3    put the car in park, got outside the car,

4    put my hands on the car because he

5    stopped me but he was rude.  He threw my

6    license on the ground, he used profanity

7    towards me.  He said I said "F" him,

8    which I didn't, and he was just -- he

9    used a lot of unnecessary language and

10   did a lot of unnecessary things in his

11   process.  He gave me a disorderly conduct

12   ticket and I did nothing.  That was like

13   one of my worse issues as far as the

14   police.

15          MR. THARP:  So you had an incident.

16   Doesn't sound satisfactory?

17          PROSPECTIVE JUROR SALTER:  It

18   wasn't satisfactory.

19          MR. THARP:  To say the least, it

20   wasn't satisfactory.  Is that the only

21   contact with the police?

22          PROSPECTIVE JUROR SALTER:  I got a

23   speeding ticket when I wasn't speeding.

24   I was looking for an address.  Police

25   officer pulled me over, said I was

1    speeding.  I said, sir, I didn't agree

2    with him.  He said I was speeding.  I had

3    to accept it.  I had to go to court.  Way

4    he wrote it on the ticket, I got my court

5    date wrong.  I had a break-in at my house

6    at night one day while I was at work.

7    Had a break-in.  Came home to see about

8    the break-in.  The police was at my

9    house, Cincinnati police.

10             MR. THARP:  This is your home?

11             PROSPECTIVE JUROR SALTER:  Yes.

12   When the house got broke into, I got off

13   work, came home and the police ran my

14   tags.  When I pulled up and they seen I

15   had a warrant from Lockland, they

16   wouldn't let me see about anything

17   happened in my house.  Put me in back of

18   the police car after they finished asking

19   me questions, would let me see about my

20   house.  After they put me in the car,

21   they said they couldn't let me out.

22             MR. THARP:  That stinks.  Neither

23   of those were satisfactory?

24             PROSPECTIVE JUROR SALTER:  No.

25             MR. THARP:  Now, let's talk about

1      your house.  Did they investigate that,

2      that you know of?

3           PROSPECTIVE JUROR SALTER:  No, they

4      didn't.

5           MR. THARP:  Was any closure?

6           PROSPECTIVE JUROR SALTER:  No.

7           MR. THARP:  Any suspect found?

8           PROSPECTIVE JUROR SALTER:  No.

9           MR. THARP:  Two incidences don't

10     sound happy.  Have you ever seen an

11     incident where police did it correctly?

12          PROSPECTIVE JUROR SALTER:  I run

13     into plenty of cops.  I got pulled over

14     for running a stop sign.

15          MR. THARP:  Rolling stop?

16          PROSPECTIVE JUROR SALTER:  Yes,

17     rolling stop.  I don't run into a lot of

18     decent police officers, but I don't blame

19     them for the bad.  You got some bad, you

20     got some good.  You can't put those

21     situations together.

22          MR. THARP:  Based on your contacts,

23     I wouldn't be happy about -- you weren't

24     -- will you be able to hear the evidence

25     fairly and impartially or will you have a

1     bias?

2          PROSPECTIVE JUROR SALTER:  I will

3     be able to hear it and judge it for what

4     it is.

5          MR. THARP:  Beyond a reasonable

6     doubt, if the State provides evidence

7     that gentleman is guilty, will you be

8     able to convict him?

9          PROSPECTIVE JUROR SALTER:  Yeah.

10         MR. THARP:  Or yes?

11         PROSPECTIVE JUROR SALTER:  Sure.

12    Yes.

13         MR. THARP:  Okay.  If you don't, I

14    understand.  We are not going to go

15    there.  You said earlier you believe you

16    would be a good juror.  What do you

17    think?

18         PROSPECTIVE JUROR SALTER:  I feel I

19    would.

20         MR. THARP:  Tell me why.

21         PROSPECTIVE JUROR SALTER:  Well,

22    the way I was thinking about it when I

23    answered the question, more or less not

24    knowing what I was getting into, so there

25    was doubt.  But if all the evidence is

```
1          there, I would be able to do what I need

2          to.

3                    MR. THARP:  What do you feel you

4          need to do?

5                    PROSPECTIVE JUROR SALTER:  I feel

6          like I need to be able to know the

7          difference between the truth and a lie.

8                    MR. THARP:  How will you be able to

9          tell that?

10                   PROSPECTIVE JUROR SALTER:  By the

11         evidence, questions I guess, you guys

12         ask.

13                   MR. THARP:  Not so much questions;

14         more, the answers, correct?

15                   PROSPECTIVE JUROR SALTER:  Ask

16         questions, you get answers.

17                   MR. THARP:  Depends.  Do you think

18         you could be fair and impartial for the

19         State?

20                   PROSPECTIVE JUROR SALTER:  Yes.

21                   MR. THARP:  Thank you.

22                   Pass for cause.

23                   THE COURT:  Thank you.

24                   Mr. Jackson.

25                   MR. JACKSON:  Good afternoon.  How
```

1        are you?

2            PROSPECTIVE JUROR SALTER:  Doing

3        well.  How about yourself?

4            MR. JACKSON:  Pretty good. did you

5        hear what I asked the other members of

6        the panel?

7            PROSPECTIVE JUROR SALTER:  Yes,

8        sir.

9            MR. JACKSON:  I wanted to ask

10       specifically about whether there is any

11       set of facts or circumstances presented

12       to you, you say you did something you

13       didn't do?

14           PROSPECTIVE JUROR SALTER:  I would

15       say yes.

16           MR. JACKSON:  What would those

17       circumstances be?

18           PROSPECTIVE JUROR SALTER:  Like the

19       other gentleman stated, when you are

20       doing court, for instance, when you are

21       in court, there are a lot of things that

22       happen.  You hear so many different

23       things.  You have one person telling you

24       one thing, another person telling you

25       another thing.  If they hit you with a

1      deal and they tell you after they give

2      you this deal, they tell you if you don't

3      accept this deal, there is a possibility

4      that you will get such and such amount of

5      time, that scares a person.  They telling

6      you, you do fifteen years but you take

7      this plea, you will get four to five

8      years, something like that, that will

9      make you turn your judgment.

10          MR. JACKSON:  You could see a

11     person saying that they did something to

12     avoid those consequences or much worse

13     consequences; is that fair to say?

14          PROSPECTIVE JUROR SALTER:  Yes.

15          MR. JACKSON:  Have you had friends

16     or relatives involved in the criminal

17     justice system?

18          PROSPECTIVE JUROR SALTER:  Yes,

19     sir.

20          MR. JACKSON:  Have any of those

21     experiences caused you to have a negative

22     feeling about this process?

23          PROSPECTIVE JUROR SALTER:  No.

24          MR. THARP:  You mentioned the

25     officer.  I think you were candid.  There

144

1      are some good officers and some bad?

2              PROSPECTIVE JUROR SALTER:  Yes.

3              MR. JACKSON:  Do you think you

4      could be fair, listen to the police

5      officers who testify in this instance?

6              PROSPECTIVE JUROR SALTER:  Most

7      definitely.

8              MR. JACKSON:  Pass for cause.

9              THE COURT:  Mr. Jackson, you are up

10     as far as challenges.

11             MR. JACKSON:  We would like to

12     thank and excuse Ms. Brieden.

13             PROSPECTIVE JUROR BRIEDEN:  You are

14     excused with our thanks.

15             Mr. Showalter.

16             (Prospective Juror Brieden was

17     excused and Prospective Juror Showalter

18     was seated.)

19             THE COURT:  Thank for your service.

20     Hope you make it on another case.  Thank

21     you for coming down.  Were you able to

22     hear the questions that were asked by

23     myself and the attorneys?

24             PROSPECTIVE JUROR SHOWALTER:  Yes.

25             THE COURT:  Any questions, problems

145

1    or concerns with any of the questions

2    asked?

3         PROSPECTIVE JUROR SHOWALTER:  No.

4         THE COURT:  Know of any reason

5    whatsoever why you could not sit on this

6    jury and be anything but a fair and

7    impartial juror?

8         PROSPECTIVE JUROR SHOWALTER:  No.

9         THE COURT:  Thank you very much.  I

10   appreciate it.

11        Mr. Tharp.

12        MR. THARP:  Good afternoon.  Seat

13   six has become the hot seat.

14        You served as a juror 2001 Butler

15   County?

16        PROSPECTIVE JUROR SHOWALTER:

17   That's correct.

18        MR. THARP:  Criminal case?

19        PROSPECTIVE JUROR SHOWALTER:  Yes.

20        MR. THARP:  Separate, different

21   from this matter.  Do you think that case

22   will have any bias for you?

23        PROSPECTIVE JUROR SHOWALTER:  No.

24        MR. THARP:  Do you think it might

25   help that you have gone through things

1    before?

2

3         PROSPECTIVE JUROR SHOWALTER:  I

4    don't know it will necessarily help me.

5    I understand the routine.

6         MR. THARP:  Are you comfortable

7    being here?

8         PROSPECTIVE JUROR SHOWALTER:

9    Yes, sir.

10         MR. THARP:  Based on that

11    experience, do you want to be on this

12    jury?

13         PROSPECTIVE JUROR SHOWALTER:

14         Everyone has a compulsion to want

15    to be on a jury.

16         MR. THARP:  Are you comfortable

17    being here?

18         PROSPECTIVE JUROR SHOWALTER:  Yes.

19         MR. THARP:  You have been involved

20    in a civil matter, not a criminal matter;

21    is that correct?

22         A civil matter has completely

23    different rules.  Understand?

24         PROSPECTIVE JUROR SHOWALTER:  Yes.

25         MR. THARP:  As the Judge said, you

1       were able to hear prior questions and

2       discussions?

3                   PROSPECTIVE JUROR SHOWALTER:  Yes.

4             MR. THARP:  Anything come to mind?

5                   PROSPECTIVE JUROR SHOWALTER:  No.

6             MR. THARP:  What do you do?

7                   PROSPECTIVE JUROR SHOWALTER:

8             Environmental safety health

9       specialist for an aerospace company.

10            MR. THARP:  As part of that, do you

11      work with other people?

12                  PROSPECTIVE JUROR SHOWALTER:  From

13      the Department of Safety.

14            MR. THARP:  Supervisory position?

15                  PROSPECTIVE JUROR SHOWALTER:  Yes.

16            MR. THARP:  So you work well with

17      others, would you say?

18                  PROSPECTIVE JUROR SHOWALTER:  Yes.

19            MR. THARP:  Would they say that?

20                  PROSPECTIVE JUROR SHOWALTER:  I

21      believe so.  Try to take their best

22      interest at heart, thinking about issues

23      of safety.

24            MR. THARP:  Think you would be okay

25      working with a group of people in a

1          setting such as this?

2                    PROSPECTIVE JUROR SHOWALTER:  Yes.

3                    MR. THARP:  Making important

4          decisions?

5                    PROSPECTIVE JUROR SHOWALTER:  Yes.

6                    MR. THARP:  Do you believe you

7          would be good?  You served as a juror

8          before?

9                    PROSPECTIVE JUROR SHOWALTER:  Yes.

10                   MR. THARP:  Will you be fair and

11         impartial to both the State and the

12         defense?

13                   PROSPECTIVE JUROR SHOWALTER:  Yes.

14                   MR. THARP:  Thank you very much.

15                   Pass for cause, Your Honor.

16                   THE COURT:  Thank you.

17                   Mr. Jackson.

18                   MR. JACKSON:  Good afternoon,

19         Mr. Showalter.  If I understand your

20         answer, you said you have a grandfather,

21         two uncles and three cousins --

22                   PROSPECTIVE JUROR SHOWALTER:  Who

23         are police officers.

24                   MR. JACKSON:  Are they local?

25                   PROSPECTIVE JUROR SHOWALTER:

1    Perkins Burg, West Virginia.  Two
2    are deceased and three of them are
3    retired.
4        MR. JACKSON:  Safe to say you have
5    a favorable attitude towards police
6    officers?
7        PROSPECTIVE JUROR SHOWALTER:  I
8    have not had any negative experience with
9    police officers.
10       MR. JACKSON:  Do you think it is
11   possible you could, in some form or
12   fashion?
13       PROSPECTIVE JUROR SHOWALTER:  Have
14   a negative connotation?  I think anyone
15   could.
16       MR. JACKSON:  I guess a more
17   specific way of asking the question is,
18   does your familial relationship with
19   these officers sway you one way or the
20   other towards police officers, in
21   general?
22       PROSPECTIVE JUROR SHOWALTER:  The
23   way my cousins grew up, I am not sure.
24       MR. JACKSON:  Went to high school
25   with a lot of police officers.

1    Questionable stuff they didn't report.

2    The bottom line is, would you judge any

3    police officer like you would judge

4    anyone else on the witness stand?

5        PROSPECTIVE JUROR SHOWALTER:  Yes.

6        MR. JACKSON:  Let's talk about the

7    obscenity trial in Butler County.  I

8    don't need to know the details, but was

9    it a video store situation or an

10   individual?

11       PROSPECTIVE JUROR SHOWALTER:  It

12   was an individual that owned an adult

13   video store that was accused of selling

14   obscenity.

15       MR. JACKSON:  I will tiptoe into

16   this lightly.  Was it regular obscenity

17   or was it illegal activity or more adult

18   pornographic material?  Let me tell you

19   why I am asking.  We, in our fair county,

20   had issue of charges people selling adult

21   movies that are not necessarily illegal

22   but there are laws against them.  Was it

23   like that, or something worse?

24       PROSPECTIVE JUROR SHOWALTER:  No,

25   it was more along those lines.  The

1    underlying situation where an individual

2    went in and purchased -- used his

3    father's identity and credit card in

4    order to purchase and they turned that

5    evidence over to the police and used that

6    individual in order to bring charges

7    against the store.

8         MR. JACKSON:  Like a sting

9    operation?

10         PROSPECTIVE JUROR SHOWALTER:  I

11    would assume you might call it that.

12         MR. JACKSON:  Did you sit and hear

13    the entire trial?

14         PROSPECTIVE JUROR SHOWALTER:  Yes,

15    I did.

16         MR. JACKSON:  How did you feel

17    about the process?  Was it surprising to

18    you the way things were handled?

19         PROSPECTIVE JUROR SHOWALTER:  I

20    think the biggest impact I had was from

21    the juror process.  We were given

22    instructions by the Judge as to what the

23    law was in the State of Ohio.  Then we

24    had to apply that to the information

25    presented to us.

1    MR. JACKSON:  Did you feel you were

2    able to do that?

3         PROSPECTIVE JUROR SHOWALTER:

4    Absolutely.

5         MR. JACKSON:  Did you have strong

6    feeling, positive or negative, about the

7    attorneys, prosecutor or defense

8    attorney?

9         PROSPECTIVE JUROR SHOWALTER:  No.

10         MR. JACKSON:  Did you think

11    everybody -- in your opinion, were the

12    people involved professionals?

13         PROSPECTIVE JUROR SHOWALTER:  Yes.

14         MR. JACKSON:  There are times I

15    talk to some jurors where they half

16    expect one of us, usually me, to yell at

17    people, do stuff like that.  That

18    generally doesn't happen.  Did you see

19    any of that out there?

20         PROSPECTIVE JUROR SHOWALTER:  No.

21         MR. JACKSON:  Nothing about that

22    process causes you to want to get off

23    this jury and not serve?

24         PROSPECTIVE JUROR SHOWALTER:  No.

25         MR. JACKSON:  Thank you.

1       THE COURT:  Mr. Tharp, back to you.

2       MR. THARP:  State would like to

3  excuse Dante Salter.  Thank you for

4  coming down.  Thank you very much.

5       THE COURT:  Let the record reflect

6  a sidebar outside the presence of the

7  jury.

8       (Discussion was held at sidebar.)

9       MR. JACKSON:  I would like to make

10  a challenge under Batson vs. Kentucky

11  based on the fact that Prosecutor Tharp

12  has excused Dante Salter.  Dante Salter

13  is the second African-American man and

14  the only one in the veneer that we have

15  that was left.

16       Previously, Mr. Tharp excused

17  Melvin White, also an African-American

18  man.  There are only two African

19  Americans on the jury, as we speak.

20  There are no more in the jury panel.  I

21  argue it violates the Supreme Court

22  ruling.

23       MR. THARP:  I ask Mr. Salter be

24  excused at this point.

25       THE COURT:  You are saying the

1      State exercised a peremptory challenge on

2      the basis of race?

3              MR. JACKSON:  Correct.

4              THE COURT:  Ask you, Mr. Tharp, did

5      you want to say anything?

6              MR. THARP:  I would point out that

7      there are two African Americans currently

8      on the veneer; Michelle Wilcox and Jamaya

9      Johnson.  That would say Mr. White as

10     well as Mr. Salter, they gave answers

11     that the State would believe would

12     indicate a bias against police officers

13     in that both instances the prosecutor

14     never asked whether those officers

15     happened to be, what their race was.

16     This case, there is no indication at all

17     that there was bias towards a particular

18     officer but against officers.  Mr. Salter

19     described several instances -- he did not

20     list at all -- the jury questionnaire, as

21     a matter of fact, I had to point out on

22     number ten, have you or a member of your

23     family been charged with a crime?

24     Explained he would put down N/A, not

25     applicable.  I questioned him.  He was

155

1    not forthcoming in his questionnaire.  He

2    described several situations that were

3    unsatisfactory with the police.  He

4    himself said there are many officers that

5    are bad.

6         Based on that, I had the direct

7    feeling with him not being forthcoming on

8    his questionnaire, his description of

9    events that occurred, we felt he was

10   unfit at that time to remain on the

11   veneer.  That's why we used our

12   peremptory, not based on race.  It was

13   based on his answers given during Voir

14   Dire.

15        MR. JACKSON:  I would respond

16   Mr. Salter, as I recall, testified there

17   were some very bad officers and very good

18   officers, which I think most normal

19   situations, I think any individual, no

20   matter what their race or wherever they

21   are from, would have to agree with that

22   as a general statement, based especially

23   upon media, news reports.  I would argue

24   that he didn't express bias one way or

25   the other towards police or anything

1    else.  Therefore, the second

2    African-American excused from the jury

3    and we have no others in the veneer.

4        THE COURT:  It is not my job to

5    determine what constitutes -- it appears

6    there are two black jurors on the jury.

7    I am not sure what Ethiopian -- I don't

8    know.  That's why this is challenging to

9    me.  Be that as it may, I will overrule

10    your Batson.  You must offer a

11    race-neutral explanation.  Your Batson

12    challenge does not need to rise to the

13    level justifying challenge for cause.  I

14    believe the explanation offered by the

15    State is race neutral.  Therefore, I

16    overrule the Batson challenge.

17        Anything further?

18        MR. THARP:  Nothing.

19        MR. JACKSON:  Nothing.

20        THE COURT:  Let's wrap it up.  Call

21    it a day.  Start with who we put over

22    there.  Start with him tomorrow.

23        MR. THARP:  Ms. Gloria Miller.  I

24    think we should walk her in.

25        THE COURT:  I will call her in and

```
 1              call it a day.
 2                   Gloria Miller, could you take that
 3              seat over there, please.
 4                   (Prospective Juror Gloria Miller
 5              was seated.)
 6                   THE COURT:  Your name is Gloria
 7              Miller?
 8                   PROSPECTIVE JUROR MILLER:  Yes.
 9                   THE COURT:  Were you able to hear
10              the questions asked my by myself as well
11              as the attorney?
12                   PROSPECTIVE JUROR MILLER:  Yes.
13                   THE COURT:  Do you have any
14              questions, problems or concerns with the
15              questions asked?
16                   PROSPECTIVE JUROR MILLER:  No.
17                   THE COURT:  Do you know of any
18              reason you could not sit on this jury and
19              be anything but a fair and impartial
20              juror?
21                   PROSPECTIVE JUROR MILLER:  No.
22                   THE COURT:  With that, we will call
23              it a day.  Part of the reason I was
24              trying to hustle is anybody I excused
25              didn't have to come back tomorrow.
```

1   Unfortunately, you guys are left.  As you

2   can see, we are picking two alternates.

3   At least two will be on.  May have more.

4   We need everybody back tomorrow.

5   Appreciate your hard work.  Nice of you.

6   Doing a great job.

7        If everybody could come back

8   tomorrow.  11 o'clock is when we can get

9   started.  If you don't mind, be here a

10   couple minutes before 11 o'clock.  As far

11   as the process, we will go to 1 o'clock.

12   I will take a short break to run

13   downstairs five to ten minutes.  I was

14   close today to take care of my fellow

15   Judge's situation.  We will go from 1

16   o'clock.  We will take a break from 1:00

17   to 2:00 for lunch.  For everybody on the

18   jury, again, to no later than 4:30.  So

19   come back to my jury room.  Go upstairs,

20   if you come down earlier, computers,

21   stuff, want to watch TV, you are welcome

22   to do that.  Now you are with me, Judge

23   Dinkelacker, until excused or told

24   otherwise.  Room 360.

25        Do not discuss this case among

```
 1          yourselves.  Do not permit anyone to
 2          discuss it with you or in your presence.
 3          It is your duty to not form or express an
 4          opinion on the case until it is submitted
 5          to you.  We are not close to that at this
 6          point.  You know what's going to happen.
 7          Human nature.  Go home tonight.  What are
 8          you doing there?  Well, I will be on a
 9          case.  That's about it.  Blame it on me.
10          The Judge warned me very sternly.  You
11          are not to discuss the case.  It is
12          important.  We don't want somebody at
13          your house influencing you in any way.
14          They are not going to be here to watch
15          this whole thing.  They are not going to
16          make the decision.  You are.  Need to
17          forget about the case.  Tell them you
18          will tell them about it when it is over.
19          But for now, please remember, don't talk
20          to anybody about this case.  Everybody
21          okay?  There are a lot of admonitions.
22          If you want to bring something to drink,
23          you are welcome to do that.  I shy away
24          from food.  If you have a medical
25          situation and need food, that's fine.
```

1    Cell phones -- no cell phones as far as

2    taking any pictures, recording or check

3    things on your phone.  You can't do that

4    in regards to the case.  What I don't

5    want to do is say you can't bring your

6    cell phone in here.  There are emergency

7    situations where you need that had an

8    actual experience of that.  But don't

9    look anything up.  Don't use cell phones

10   while here to do anything as far as this

11   case or ever.

12        Other than that, you can bring it

13   in.  I don't think any of this will be in

14   the news.  If something would happen with

15   the news, turn off or don't look away.

16   If there is something, report to us

17   tomorrow.

18        Everybody okay?  Before we break,

19   anything for the record?

20        MR. THARP:  Nothing.

21        THE COURT:  Mr. Jackson?

22        MR. JACKSON:  Nothing, Your Honor.

23        THE COURT:  Thank you for your

24   service.  You are excused.  See you

25   tomorrow at 11:00.

```
 1                (Prospective jurors were excused.)

 2

 3                THE COURT:  Please be seated for a

 4        second.  Let the record reflect the jury

 5        left the courtroom.

 6                Anything for the record?

 7                MR. THARP:  Nothing.

 8                THE COURT:  Mr. Jackson?

 9                MR. JACKSON:  No, Your Honor.

10                THE COURT:  Be here tomorrow at

11        11:00 o'clock.  We will start with you

12        questioning Ms. Gloria Miller.

13                Thanks for your patience,

14        everybody.

15                (Proceedings adjourned.)

16

17

18

19

20

21

22

23

24

25
```

```
 1                        CERTIFICATE

 2             I, Ann Marie Arenas, RPR, the

 3   undersigned, an Official Court Reporter for the

 4   Hamilton County Court of Common Pleas, do

 5   hereby certify that at the same time and place

 6   stated herein, I recorded in stenotype and

 7   thereafter transcribed the within 161 pages,

 8   and that the foregoing Transcript of

 9   Proceedings is a true, complete, and accurate

10   transcript of my said stenotype notes.

11             IN WITNESS WHEREOF, I hereunto set my

12   hand this 28th day of October, 2015.

13

14                   _____

15                   Ann Marie Arenas, RPR
                     Official Court Reporter
16                   Court of Common Pleas
                     Hamilton County, Ohio
17

18

19

20

21

22

23

24

25
```